UNITED STATES of America,
Plaintiff–Appellee,

v.

Evaristo RIVERA PEDIN, Raymond Arrastia, Defendants–Appellants.

No. 87–5090.

United States Court of Appeals,
Eleventh Circuit.

Dec. 21, 1988.

Edward F. McHale, Melvyn Kessler, Hal Scott Kessler, Miami, Fla., for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Linda Collins Hertz, Harriett R. Galvin, Asst. U.S. Attys., for the U.S.

Before TJOFLAT and HILL, Circuit Judges, and WARD *, District Judge.

TJOFLAT, Circuit Judge:

We set aside appellants' convictions and remand this case to the district court for a new trial on two grounds. First, the prosecutor knowingly permitted the Govern-

---

\* Honorable Horace T. Ward, U.S. District Judge for the Northern District of Georgia, sitting by designation.

1. 18 U.S.C. § 3500 (1982). For the text of the statute, see *infra* note 10.

---

ment's principal witness to testify falsely with respect to a matter critical to that witness' credibility; second, the district court, in failing to conduct an *in camera* examination of alleged Jencks Act [1] material, permitted the prosecutor to withhold from appellants' counsel evidence favorable to the defense.

## I.

Appellants, Raymond Arrastia and Evaristo Rivera Pedin, were convicted by a jury of conspiring to smuggle marijuana and cocaine into the United States.[2] The conspiracy took place in the Southern District of Florida and covered a three-month period, March 18, 1985 to May 6, 1985. The Government's case against appellants was built on the testimony of an informant, Vincent Ream, secret tape recordings Ream made of telephone conversations he had with appellants, and selected pages from Ream's diary. Ream's credibility was vital to the Government's case; had it been successfully impeached, there would have been no convictions.

Ream told the jury that his involvement in this case began in March 1985. He said that prior to that time he had piloted airplanes for drug smugglers on at least thirty separate occasions and had come under investigation by the Florida Department of Law Enforcement (FDLE). Ream learned of the investigation and, in an effort to avoid prosecution, decided to cooperate with FDLE and the United States Drug Enforcement Administration (DEA). Ream thus became a paid informant for both agencies.

On the basis of information provided by Ream, the DEA initiated an investigation of Ream's long-time acquaintance, appellant Arrastia. Refreshing his recollection from his personal diary, Ream told the jury that on the morning of March 18, 1985, he made a tape-recorded call from his home in

---

2. *See* 21 U.S.C. §§ 952(a), 963 (1982 & Supp. IV 1986). Arrastia was also convicted of two counts of using a communication facility to further the conspiracy in violation of 21 U.S.C. § 843(b) (1982).

Sarasota to Arrastia. As the recording revealed, Ream told Arrastia that he had an airplane, and Arrastia replied "there's a job" with "money up front." Ream testified that he understood Arrastia to be soliciting his skills as a pilot to make a drug run. Later that day Ream flew his plane, a Piper Cherokee Warrior, to Miami and met with Arrastia and appellant Pedin. According to Ream, the three made plans for Ream to travel to Puerto Rico with Pedin to inspect and determine the airworthiness of an airplane that Ream would use to transport marijuana and cocaine from Colombia to the United States. Ream received $500 in cash from Arrastia as an advance, which he turned over to the DEA agents who were monitoring his activity.

On March 22, Arrastia gave Ream a commercial airline ticket to San Juan, Puerto Rico. Pedin met Ream in Puerto Rico, and the two went to Pedin's apartment. The next day Pedin gave Ream a pilot's map of Puerto Rico and told him that the Queen Air aircraft he was to inspect was unavailable. Ream flew back to Miami on a ticket provided by Pedin. Ream never returned to Puerto Rico to inspect the Queen Air.

Ream testified that he next met with Arrastia a month later, on April 25, and the two went to the home of Ricardo Borato–Diaz,[3] where they witnessed about a dozen men dump sacks of money on a table. Ream thought that he would eventually receive some of this money in payment for his services.

On April 27, Ream made another tape-recorded call to Arrastia in which Arrastia said that a Venezuelan friend would be coming to town and "[h]e's talking about maybe 30, 40, I don't know." Ream testified that he understood this to mean that Arrastia had a Venezuelan source for a new drug smuggling operation. In a tape-recorded call on April 29, Arrastia told Ream that he had "something going for, from Thursday on" and that he would give Ream the "address," which Ream took to mean the coordinates of an airstrip in Colombia where Ream would land his plane. To Ream's inquiry, "no grass?," Arrastia replied, "no ... we're big time now," which Ream believed meant that he would be transporting cocaine rather than marijuana.

During the next few days Ream modified the fuel tanks of his Piper airplane for the long flights to and from Colombia, rendering the plane legally unfit for flight in the United States. Ream later notified Arrastia that he could not fly to Colombia as planned because the airstrip that he was using was being occupied by several flyers who were holding a "spot-landing contest." Ream said that after this conversation he and Arrastia did not discuss drug smuggling. As it turned out, Ream never flew to Colombia, no narcotics were ever imported, and the undercover investigation was terminated.

The defense's cross-examination of Ream began after he had been on the witness stand for nearly a day. Counsel for Arrastia went first and immediately began to question Ream about his personal diary, twelve redacted pages of which Ream had used to refresh his recollection on direct examination.[4] Counsel believed that other pages of Ream's diary related to Ream's testimony on direct examination and also to his credibility. Ream indicated, in response to defense counsel's questions, that he had made entries in his diary for most of the events he had described. At this point, the court adjourned for the day. Following adjournment, defense counsel asked the prosecutor for all of the Jencks Act material in the Government's possession, including all of the pages of Ream's diary for the period of Ream's undercover work in the case. The prosecutor stated that he would reexamine those pages during the evening and produce any that might be relevant before the trial resumed the next morning.

3. Ricardo Borato–Diaz was charged as a co-conspirator in this case. The jury found him not guilty.

4. Prior to the swearing in of the jury in this case, the prosecutor had given copies of these pages to defense counsel. The prosecutor had also provided the court with both redacted and unredacted copies of the twelve diary pages it had disclosed to the defense.

The following morning, the prosecutor informed defense counsel that no further diary entries were relevant; therefore he produced nothing more. Counsel nevertheless continued to tailor his examination of Ream in such a way as to demonstrate the need for additional diary entries.

Counsel questioned Ream about each day of his involvement in the alleged conspiracy and, in the process, asked Ream what he had written in his diary for that day. When counsel reached the events of April 25—the day Ream and Arrastia purportedly saw a dozen men emptying sacks of money onto a table at the Borato–Diaz residence—counsel asked Ream if he had made an entry in his diary for that day. Ream said that he had made an entry, and the prosecutor immediately handed a copy of the entry to defense counsel. At this point, the defense asked the court for permission to approach the bench. The court granted the request, and a sidebar conference followed out of the hearing of the jury. Defense counsel asked the court to direct the prosecutor to produce all of the diary entries for the entire period of Ream's involvement in the case; counsel also requested a recess so that they could examine the additional entries.

The court instructed the prosecutor to reexamine the entire diary and give the defense any undisclosed entries that might relate to Ream's testimony. The court then declared a ten-minute recess to permit the prosecutor to conduct his examination. At the conclusion of the recess and before the jury returned, defense counsel, having received nothing from the prosecutor, requested the court to examine the diary *in camera* for Jencks Act material. The court refused counsel's request. The court did, however, direct the clerk to place the diary under seal as part of the record.

When the jury returned, the defense continued to question Ream about his diary but gained no further indication that Ream had made any relevant entries not already disclosed. Consequently, the defense abandoned the quest for information concerning additional diary entries and instead tried to impeach Ream in other ways. In response to this new line of questioning, Ream admitted that he had transported drugs numerous times in the past, that he had a history of intravenous drug use, that he had recently served time in prison for possession of 3,000 Quaaludes, that while in prison he had become skilled at the art of deception, that he was presently in great need of money, and that he received $4,000 from the DEA for his undercover work and testimony. Finally, the defense explored the possibility that Ream had colored his testimony against Arrastia because Arrastia had refused to pay him off.

Counsel asked Ream three times, in three different ways, whether he had spoken with Ream's and Arrastia's mutual friend, private detective Jack Miller, about disappearing as a witness in the case for a price:

Q. And have you had conversations with Jack Miller since the indictment in this case concerning attempting to extort funds from the defendants in exchange for your disappearing as a witness in this case? ...

A. No....

Q. Did you ever discuss the exchange of funds with Jack Miller in exchange for either the way you would testify or whether or not you would be available for the subpoena to testify in this case?

A. No, sir, I didn't.

Q. Never?

A. No, sir.

Q. Did Jack Miller ever approach you and talk to you about funds [that] could be available if you disappeared: did he ever discuss that?

A. No, sir.

As this colloquy indicates, Ream unequivocally denied having conversed with Miller about selling his unavailability as a witness. After Ream finished testifying, the Government called the DEA case agent[5] and then rested its case in chief. Neither

---

**5.** Agent Christopher Warner merely testified that Ream had met with Arrastia and Pedin on several occasions and that on one such occasion Arrastia handed Ream money and on another gave him an airline ticket.

Arrastia nor Pedin put on a defense.[6] The jury subsequently found them guilty as charged.

Following the return of the jury's verdicts, Arrastia moved the court, pursuant to Fed.R.Crim.P. 33, for a new trial on the ground of newly discovered evidence. This evidence, Arrastia represented, consisted of testimony Jack Miller would give if a new trial were granted. According to an affidavit from Miller, in the spring of 1986 (twelve months prior to the trial) Ream told Miller that he would be willing to disappear if Arrastia would pay him $50,000. In a written response to Arrastia's motion, the Government argued that Miller's proposed testimony would not have altered the outcome of the trial; [7] the Government therefore urged the court to deny the motion, stating that prior to trial Ream had told

> Special Agent Christopher Warner, the case agent.... that Ream had had a conversation with a private detective [presumably Miller] from which Ream believed he was being asked not to testify against Arrastia. Agent Warner spoke to the undersigned [the Assistant United States Attorney who prosecuted the case] about this and was instructed to have Ream pursue the matter. Later, [Arrastia's attorney] told the undersigned that Ream had solicited a bribe in exchange for his disappearance.

The prosecutor thus represented to the court that Ream and Miller in fact had the conversation, the existence of which Ream had unequivocally denied on the witness stand. In sum, the parties disputed whether Ream instructed Miller to solicit a bribe from Arrastia, or whether Miller offered a bribe to Ream on Arrastia's behalf; both agreed, however, that a conversation concerning an exchange of money for Ream's silence indeed took place.

Arrastia, seizing upon the Government's response, argued in a supplemental memorandum that he was entitled to a new trial on the additional ground that the prosecutor had remained silent at trial, in derogation of his duty to correct the testimony of a Government witness which he knew to be false.[8] The district court acknowledged that the prosecutor knew Ream was giving false testimony; nevertheless, the court denied Arrastia's motion for a new trial, concluding that the prosecutor's failure to correct the testimony would not "in any reasonable likelihood have affected the judgment of the jury."

We now turn to the issues presented in this appeal: whether appellants were denied Jencks Act material that would have affected the outcome of the trial, and whether the prosecutor prejudiced the appellants' case by failing to take steps to correct Ream's testimony concerning his conversation with Miller.[9] We discuss these issues in order.

---

6. Acquitted codefendant Ricardo Borato–Diaz did, however, take the stand to testify on his own behalf.

7. The prosecutor also argued that the evidence was not newly discovered. The Government stated that Arrastia's counsel had, prior to trial, approached the assistant United States Attorney in charge of the case and recounted to him the essence of the allegation in the Miller affidavit.

8. To prevail upon a motion for a new trial on the ground of newly-discovered evidence, a defendant must ordinarily show: (1) that the evidence was newly discovered and was unknown to the defendant at the time of the trial; (2) that the evidence was material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant. *See United States v. Antone*, 603 F.2d 566, 568–69 (5th Cir.1979). This showing is not applicable,

however, where "the Government's case included false testimony and the prosecution knew or should have known of the falsehood." *Id.*

9. Appellant Pedin has not raised these issues in his brief, nor has he adopted Arrastia's arguments by reference, see Fed.R.App.P. 28(e). Rather, he argues only that the trial court erred in refusing to instruct the jury on his multiple conspiracy defense—an argument we find meritless. We nonetheless treat Pedin as having adopted the issues Arrastia has presented pursuant to Fed.R.App.P. 2 (authorizing appellate courts to relieve litigants of the consequences of default where manifest injustice would result).

The situation presented here is similar to that in *United States v. Gray*, 626 F.2d 494 (5th Cir.1980), in which one codefendant neglected to adopt by reference the argument of another codefendant. The court stated:

> Ordinarily we would limit each defendant's appeal to the issues raised in his brief. How-

## II.

■ The Jencks Act, 18 U.S.C. § 3500 (1982),[10] requires that the prosecutor disclose to the defendant any written statement made by a Government witness which relates to the subject matter of the testimony that witness has given on direct examination. *See id.* § 3500(b). If the prosecutor claims that portions of the witness' written statement do not relate to the testimony, the Act requires the prosecutor to deliver the entire statement to the court for *in camera* inspection. *See id.* § 3500(c). The court then may excise any part of the statement that does not relate to the witness' testimony and deliver the redacted version to the defendant. *Id.*

Initially, we note that the prosecutor properly conceded that Ream's diary entries for the period covering Ream's involvement in the case constituted Jencks Act material. *See United States v. Carrasco,* 537 F.2d 372, 375 (9th Cir.1976) (witness' diary given to government held a "statement" within the Jencks Act). The prosecutor, however, exceeded his role when he unilaterally decided which pages of the diary met the Jencks Act requirement of "relate[ing] to the subject matter of the testimony of the witness." 18 U.S.C. § 3500(c). In *United States v. Conroy,* 589 F.2d 1258, 1272–73 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979),[11] we joined the ranks of our sister circuits that have held it impermissible for a trial judge, in reviewing Jencks Act material, to refuse to examine all of the material, and thereby abdicate his responsibility to the prosecutor. *See United States v. Washington,* 797 F.2d 1461, 1475 (9th Cir.1986); *United States v. Del Toro*

---

ever, we have discretion to suspend the Federal Rules of Appellate Procedure "for good cause shown," Fed.R.App.P. 2. Believing it anomalous to reverse some convictions and not others when all defendants suffer from the same error, we consider the arguments to be adopted, except as noted. *United States v. Anderson,* 584 F.2d 849 (6th Cir.1978). *See also Marcaida v. Rascoe,* 569 F.2d 828 (5th Cir.1978); 9 Moore's Federal Practice ¶ 228.02[8] (2d ed. 1980). This adoption does not prejudice the government which had the opportunity to fully brief all issues in response to the various contentions of the defendants.

*Id.* at 497.

10. 18 U.S.C. § 3500 (1982) provides in pertinent part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

11. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Soto,* 676 F.2d 13, 16–17 (1st Cir.1982); *United States v. Peters,* 625 F.2d 366, 370–71 (10th Cir.1980); *United States v. Walden,* 578 F.2d 966, 970–71 (3d Cir.1978), *cert. denied,* 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979); *United States v. O'Brien,* 444 F.2d 1082, 1086–87 (7th Cir. 1971). Accordingly, we hold that the district court erred in refusing to inspect *in camera* Ream's diary for the dates covered by the period of Ream's involvement in the case.

■ Although in *Conroy* we remanded the case to the district court so that it could undertake the required *in camera* examination and determine if nondisclosure of Jencks Act material warranted a new trial, 589 F.2d at 1273, we see no useful purpose to be served by a remand for such an inspection in this case. In contrast to *Conroy,* the Jencks Act material in this case has been preserved for appellate review, and we have examined it thoroughly. We find the significance of the nondisclosed pages of Ream's diary evident on their face and that "their importance as tools for impeachment of a crucial witness [was] inescapable." *United States v. Badalamente,* 507 F.2d 12, 18 (2d Cir.1974) (reversing conviction and granting new trial), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975).

The prosecutor told the district court that he had provided the defense with all of the diary pages relating to Ream's testimony before the jury. Our examination reveals that the prosecutor disclosed less than half of the diary's relevant pages. Even more disconcerting than the scope of the prosecutor's nondisclosure is the prejudicial impact caused by the withholding of two critical entries.

The first of these is Ream's entry of March 31, 1985, in which he wrote:

    9:00   getting ready to call Ray [Arrastia]
    9:30   got Ray—phone
    10:00  erase tapes
    11:00  still working on tapes.

This entry related to Ream's testimony on direct examination that he made the telephone recordings himself and that the re-

cordings were complete and accurate. This entry was, and is, an important piece of evidence; it suggests that Ream may have erased tapes previously used to record telephone conversations with appellants, therefore rendering the tapes incomplete and inaccurate. Ream was, according to his own testimony, a skilled electronics technician; he could have doctored the tapes. That he recorded his conversations with Arrastia and Pedin on his own equipment and out of the presence of the monitoring DEA agents gave him the opportunity to do so. Moreover, Ream did not promptly turn the tape recordings over to the DEA agents; instead, he frequently kept a tape until after he had recorded other conversations with appellants. Corroborating the possibility that he doctored the tapes was the circumstance that one of the tapes was incomplete, and perhaps misleading, because it did not capture the beginning of the conversation. Nor could Ream explain what some might perceive to be "clicking noises" on one or more of the tapes.

Since there is a reasonable possibility that the March 31 entry, "erased tapes," means that Ream erased tapes of his telephone conversations with appellants, as opposed to tapes of other matters not pertinent to this case, we conclude that, as a matter of common sense, much less the law, appellants were prejudiced by the nondisclosure of this diary entry. Armed with the entry, a competent cross-examiner might easily be able to convince a jury that the tapes were incomplete and inaccurate, that they were a composite reproduction, or that they omitted exculpatory or mitigating matters. This line of questioning might ultimately lead the jury to discredit Ream's testimony altogether.

The second nondisclosed diary entry pertained to Ream's testimony on direct examination that he modified his Piper Cherokee Warrior airplane by adding extra fuel tanks to make the round-trip flight to Columbia scheduled for May 5, 1985. The prosecutor elicited this testimony to bolster Ream's claim of the existence of the alleged conspiracy; for, as the prosecutor insinuated, why else would Ream have rendered his airplane unfit for anything but

drug smuggling, and undertaken the risk that the plane would be confiscated if a federal law enforcement officer discovered the tanks?

When the prosecutor elicited this testimony from Ream, the prosecutor had in his possession a diary entry which indicated that Ream may have modified his airplane for a drug smuggling venture that did not involve appellants. In his April 21 entry, Ream wrote:

> 3:00–6:00 Spent 3 hrs Ron Whitaker wants me to work next week Belize Central America—said he was facing 31 yrs. Several air strips 2 planes—go to Belize.

By his own admission, Ream had made drug flights to Latin America on thirty previous occasions. The defense was entitled to this diary entry in order to explore the possibility that Ream modified his airplane for reasons other than participation in a conspiracy with appellants.

We cannot know, of course, where defense counsel, armed with these two diary entries, could have taken Ream on further cross-examination. Nonetheless, we are satisfied that counsel could have cast substantial doubt on the credibility of Ream's testimony in the eyes of the jury.[12]

### III.

■ Appellants also claim that they are entitled to a new trial because the prosecutor failed to correct Ream's false statement that he had not conversed with Miller about a payoff for not appearing at trial. Defense counsel contend that there is a reasonable likelihood that this statement, which the prosecutor knew to be false, could have affected the jury's decision. The starting point for our analysis of this claim is the Supreme Court's holding in

*Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

In *Napue,* the principal government witness falsely stated on cross-examination that the prosecutor had not promised him anything in exchange for his testimony. The prosecutor knew that this statement was false—he had promised the witness that he would recommend that the witness' 199–year prison sentence be reduced—but did nothing to correct the statement. The Supreme Court, based on its own independent examination of the trial transcript, concluded that the prosecutor's failure to correct the false statement "may have had an effect on the outcome of the trial"[13] and accordingly set aside the jury's verdict. *Id.* at 272, 79 S.Ct. at 1179. *See also United States v. Bagley,* 473 U.S. 667, 678–80, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). We have applied the holding of *Napue* and its progeny to situations in which the prosecutor has knowingly permitted a witness to conceal, through false testimony, the witness' bias against the defendant. *See, e.g., Moore v. Kemp,* 809 F.2d 702, 719 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987) (false testimony that witness had not been given immunity from prosecution); *United States v. Cole,* 755 F.2d 748, 762–63 (11th Cir.1985) (false testimony that witnesses had not been involved in any criminal activity after they entered into their plea agreements); *Williams v. Griswald,* 743 F.2d 1533, 1541–42 (11th Cir. 1984) (false testimony that witness was under no pressure from anyone to testify); *United States v. Antone,* 603 F.2d 566, 567 (5th Cir.1979) (false testimony that witness' attorney's fees were not being paid by the state).

---

12. Because the diary entries contained evidence favorable to the defense, their nondisclosure might implicate the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as well as the Jencks Act. *Brady* holds "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1196–97. Our disposition of appel-

lants' Jencks Act claim, however, renders analysis of a possible *Brady* violation unnecessary.

13. The *Napue* test for reversible error "is equivalent to the *Chapman* [*v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ] harmless-error standard." *United States v. Bagley,* 473 U.S. 667, 679 n. 9, 105 S.Ct. 3375, 3382 n. 9, 87 L.Ed.2d 481 (1985).

The Government concedes that Ream falsely denied that he had a conversation with Miller concerning his appearance as a prosecution witness. The Government also concedes that when Ream uttered the denial, the prosecutor was aware that it was false. The Government, however, asks us to excuse the prosecutor's subsequent inaction because it had no effect on the outcome of the trial.[14] We disagree.

This is not a case in which the witness' bias becomes irrelevant because the witness' testimony is fully corroborated, nor is this a case in which the witness' testimony has been thoroughly impeached and proof of his bias would be merely cumulative. *See, e.g., McCleskey v. Kemp*, 753 F.2d 877, 885 (11th Cir.1985) (en banc), *aff'd* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *United States v. Antone*, 603 F.2d 566, 571 (5th Cir.1979). Rather, as in *Napue* and *Giglio*, the Government's case against the accused turned on the testimony of a single witness, Ream. We have stated that the prosecutor's failure to correct a witness' false testimony will warrant a reversal where, as here, the "estimate of the truthfulness and reliability of the given witness may well be determinative of guilt or innocence." *United States v. Cole*, 755 F.2d 748, 763 (11th Cir.1985) (citations omitted). We acknowledge that Ream's credibility had been eroded due to the testimony the defense elicited from him on cross-examination. The disclosure of Ream's conversation with Miller, however, would not have been merely repetitious, reinforcing a fact that the jury already knew; instead, "the truth would have introduced a new source of potential bias." *Brown v. Wainwright*, 785 F.2d 1457, 1466 (11th Cir.1986). *See also United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir.1977) ("A jury may very well give great weight to a precise reason to doubt credibility when the witness has been shown to be the kind of person who might perjure himself.").

Had the jury known that Ream spoke with Miller about receiving money for not testifying, it might well have reached a different decision as to whether Ream had fabricated incriminating testimony about appellants. We are simply unconvinced that the prosecutor's failure to disclose Ream's false testimony was "harmless beyond a reasonable doubt." *Bagley*, 473 U.S. at 680, 105 S.Ct. at 3382.

REVERSED AND REMANDED FOR A NEW TRIAL.

---

**14.** The Government also argues that the prosecutor's failure to correct Ream's false testimony should be excused because the prosecutor believed that Ream's denial was unwitting rather than knowing. This argument is without merit because the *Napue* rule applies where testimony, "even though technically not perjurious, would surely be highly misleading to the jury...." *Dupart v. United States*, 541 F.2d 1148, 1150 (5th Cir.1976).