UNITED STATES of America, Appellee,

v.

**Dharamdeo BABWAH and Deodath Maharaj, Defendants–Appellants.**

**Nos. 1557, 1775, Docket Nos. 92–1055, 92–1056.**

United States Court of Appeals, Second Circuit.

Argued May 19, 1992.

Decided Aug. 6, 1992.

Solomon H. Kaplan, Bronx, N.Y. (Stuart N. Kaplan, of counsel), for defendant-appellant Babwah.

Stanley M. Meyer, New York City (DePetris & Meyer, of counsel), for defendant-appellant Maharaj.

Ilene B. Weininger, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D.N.Y., Susan Corkery, Asst. U.S. Atty., of counsel), for appellee.

Before: LUMBARD, VAN GRAAFEILAND and KEARSE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Dharamdeo Babwah and Deodath Maharaj appeal from judgments of the United States District Court for the Eastern District of New York (Johnson, J.) convicting them of structuring cash deposits to evade currency reporting requirements, 31 U.S.C. §§ 5324(3), 5322(a), and conspiring to do the same, 18 U.S.C. § 371. Because both convictions were tainted by the admission of unlawfully secured evidence, we reverse and remand.

On June 13, 1991, Robert Devine and Brian Aryai, Special Agents of the United States Customs Service, were surveilling a house located at 103–16 107th Street in Queens. This was part of a money-laundering investigation precipitated by the attempted deposit of almost a half a million dollars in cash in a bank account of Juan Carlos and Sara Agreda. When the defendants and Mrs. Agreda left the house and drove away in a red BMW, the Agents followed. According to the Agents, the BMW was driven in an evasive manner until it was parked opposite a Citibank branch on Liberty Avenue. Maharaj, carrying a brown paper bag, then entered the bank. Devine, who followed Maharaj into the bank, overheard part of a discussion between Maharaj and a bank employee concerning currency transaction reports which banks are required to submit for

deposits in excess of $10,000. Devine also observed Babwah enter the bank, talk briefly with Maharaj, and leave. Maharaj followed shortly thereafter, leaving the brown paper bag with the bank employee.

It was established at the trial that the brown bag contained $19,880 in cash and that Maharaj had attempted to deposit $9,880 in his account and $10,000 in Babwah's account. Marilyn Kumar, the Assistant Bank Manager with whom Maharaj talked, told him that she needed some information from him because the bank had to file currency transaction reports concerning these transactions. Maharaj told her that this was unnecessary because the cash was going into two accounts. Ms. Kumar explained that when a customer attempts to deposit more than $10,000 in cash, the bank must file a currency transaction report whether or not the money is deposited into one account or split among several accounts. Ms. Kumar demanded Maharaj's passport, and he handed it over. He was instructed to send Babwah in to provide the additional information Ms. Kumar needed to complete the form. Although Babwah did come into the bank shortly thereafter, he spoke only to Maharaj and left. Subsequently, while not under surveillance, Babwah returned to the bank and told Ms. Kumar that it was unnecessary to fill out a currency transaction report because the money was going into two separate accounts. Ms. Kumar went through her explanation again and asked Babwah for his passport. He refused. As a result, Ms. Kumar was unable to complete the report. She tore up the form, and voided the transaction.

When Maharaj and Babwah left the bank, the Agents again followed the BMW but lost it after it had run two red lights. That afternoon, after the Agents had resumed surveillance of the 107th Street house, they saw Maharaj leave the house carrying a large suitcase and ride away in the BMW with Babwah and Mrs. Agreda. The BMW took a circuitous route to a house near 116th Street and Atlantic Avenue. The three occupants went into the house and came out with more suitcases.

When the defendants resumed their evasive driving techniques, the Agents decided to pull them over. The Agents, who were driving separate cars, effectively boxed the defendants in by parking one of their cars in front and one in the rear of the BMW. Babwah got out of the car but Aryai, using a megaphone, told him to get back in. Devine and Aryai then approached the BMW, identified themselves as Customs Agents, and told defendants that they were investigating money laundering. At no time did the Agents display their weapons. Aryai had Babwah get out of the car and raise his hands, at which time Aryai patted him down. Devine told Maharaj and Mrs. Agreda to keep their hands where he could see them.

When Aryai asked Babwah for the car registration, Babwah said that the car was not his but produced the registration, the address on which was that of the 107th Street house. Aryai then asked Babwah whether they could search the car and the luggage. Babwah consented to the search but informed the Agents that the luggage belonged to Mrs. Agreda. Mrs. Agreda stated that she was on her way to the airport, that the luggage was hers, and that she had no objection to a search. The Agents searched the car and the luggage, finding nothing incriminating.

At this point, in response to a question by Aryai, Babwah denied that he ever had been to the 107th Street address. At the Agents' request, defendants and Mrs. Agreda then agreed to go with them to that location. Devine, leaving his car behind, rode in the back seat of the BMW, with Babwah driving and Maharaj in the passenger seat. Mrs. Agreda rode with Aryai in his car.

Upon arrival at the 107th Street address, Babwah and Maharaj continued to deny ever having been there. Aryai then confronted them with the fact that they had been seen there during the Agents' surveillance. Babwah and Maharaj subsequently changed their story several times, with Babwah finally admitting to living there and producing the key. Aryai asked Babwah whether they could search the resi-

dence, and Babwah consented, first verbally and then on a consent form handwritten by Aryai. Aryai found in the bedroom closet a brown paper bag containing $7,098 in singles and a duffel bag containing $168,700. Babwah then made statements which gave Aryai probable cause to believe that the money had been imported from Trinidad in violation of currency reporting requirements, following which Aryai arrested Babwah and read him his *Miranda* rights. Meanwhile, Maharaj, who was sitting in the kitchen with Devine and Mrs. Agreda, made statements which gave Devine probable cause to believe that Maharaj had violated reporting requirements in bringing money in from Trinidad, and Maharaj also was arrested and read his *Miranda* rights.

A suppression hearing was held before Judge Gerald R. Rosen, a visiting judge from the Eastern District of Michigan. Judge Rosen found that the defendants were " 'seized' and in custody within the meaning of the Fourth Amendment from the point in time when Agents Devine and Aryai pulled them over in the BMW." He also found that the Agents had probable cause to make the stop and arrest. Having determined that the seizure was lawful, Judge Rosen, citing *United States v. Moreno*, 897 F.2d 26 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990), found that Babwah voluntarily consented to the search of the 107th Street house in which he resided and denied his motion to suppress evidence seized therein. Although events subsequent to the search disclosed that Maharaj also resided at the 107th Street address, Judge Rosen, citing *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), found that Babwah's "voluntary" consent precluded both Babwah and Maharaj from challenging the search and denied Maharaj's motion, 776 F.Supp. 91 (1991).

▮ The Government makes no attempt to support Judge Rosen's finding that probable cause to arrest existed at the time the BMW was stopped. It argues instead that the initial stop and investigation did not constitute an unreasonable

Fourth Amendment seizure. We agree with this contention. *See Terry v. Ohio*, 392 U.S. 1, 16–30, 88 S.Ct. 1868, 1877–85, 20 L.Ed.2d 889 (1968); *United States v. Pelusio*, 725 F.2d 161, 165–66 (2d Cir.1983); *United States v. Harley*, 682 F.2d 398, 400–02 (2d Cir.1982). However, we are satisfied that the initial, lawful investigatory stop was transformed into a *de facto* arrest prior to the time Babwah consented to the search and that, therefore, the consent was tainted and involuntary. We hold, also, that Maharaj was entitled to challenge the validity of Babwah's alleged consent.

An investigatory stop continues as such if it remains "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra*, 392 U.S. at 20, 88 S.Ct. at 1879; *see United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir.1992).

Because the justification for the stop herein was the Agents' reasonable articulable suspicion that the luggage contained currency connected to the ongoing money-laundering investigation, it may be that Aryai's request to search the luggage was reasonably related to the circumstances that justified the stop. Asking for consent to search the luggage was a means of investigation that was "likely to confirm or dispel [the Agents'] suspicions quickly." *Sharpe, supra*, 470 U.S. at 686, 105 S.Ct. at 1575. However, despite the fact that Mrs. Agreda's luggage contained nothing incriminating, the Agents continued their detention of the defendants. They asked Babwah whether he ever had been to the 107th Street residence, and, upon receiving a negative response, escorted Babwah and the others to that address. We find that by the time they reached 107th Street, some forty minutes after the original stop, the detention of the defendants had lost its identity as a lawful investigatory stop.

■ There are, of course, no rigid limitations on the permissible duration of a stop, *id.* at 685, 105 S.Ct. at 1575, or on the extent to which a detainee may be moved during a stop, *Glover, supra,* 957 F.2d at 1012. However, instead of terminating the seizure when their suspicions concerning contraband proved unfounded, the Agents continued to detain the defendants while they "embarked upon [an] expedition for evidence in the hope that something might turn up." *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). The Agents already knew that Babwah had been in the 107th Street residence, and what showing it to him was going to accomplish is not readily apparent. This continued detention was nothing more than an unlawful fishing expedition. The fact that it happened to be successful does not, of course, make it lawful.

■ Because the unlawful detention occurred before Babwah consented to the search of his residence, evidence seized in that search was inadmissible unless the connection between the unlawful detention and the discovery of the challenged evidence was so attenuated by Babwah's consent as to remove the taint. Where, as here, the consent itself was tainted by the Government's unlawful conduct, it was ineffective to justify the search. *See Florida v. Royer,* 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329–30, 75 L.Ed.2d 229 (1983) (plurality op.). The consent was given shortly after the detention became unlawful. Nothing intervened that would break the causal connection between the two. Indeed, the whole purpose of extending Babwah's custody seems to have been the hope of obtaining his consent. There can be no conclusion other than that Babwah's consent was gotten through exploitation of the unlawful seizure. *See Dunaway v. New York,* 442 U.S. 200, 218–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979). Accordingly, the evidence seized pursuant to his consent should have been suppressed.

■ We reject the Government's contention that admission of the unlawfully seized evidence was harmless error. The evidence at trial, viewed in the light most favorable to the Government, was sufficient to support the conviction of both defendants. The Government proved that the defendants had entered the United States together on May 14, 1991, that they both had lived at the 107th Street residence, and that they had made at least six structured deposits of between $9,500 and $10,000 prior to their arrest. This evidence, coupled with Ms. Kumar's conversations with the defendants, the defendants' evasive actions and untruthful statements when stopped and questioned by the Customs Agents, and the presence of substantial quantities of cash in their residence, all serve to support the jury's verdict. The seized cash was not treated as a minor piece of evidence. In the prosecutor's summation, she continually referred to the "mountain of cash" seized, and argued that the defendants' purpose in structuring bank deposits was to conceal the possession of this money. The fact that defendants made incremental deposits of just below $10,000 while sitting on such a large sum of cash, gives rise to a reasonable inference that they had knowledge of the reporting requirement at the time they made those deposits and that they willfully conspired to withhold from the Government information to which it was entitled. *See United States v. Scanio,* 900 F.2d 485, 491 (2d Cir.1990). In short, the "mountain of cash" was an integral part of the Government's case, and the improperly admitted evidence of its existence cannot be considered harmless.

■ Maharaj, like Babwah, moved below for suppression of the evidence seized during the search of his residence. His attorney on appeal, who did not represent him below, neglected to argue error in the adverse suppression ruling, apparently persuaded by Judge Rosen's reliance upon *Matlock, supra,* 415 U.S. 164, 94 S.Ct. 988. Maharaj's sole challenge on appeal is to the sufficiency of the evidence, which challenge, as we have noted, is without merit. Ordinarily, of course, an argument not raised on appeal is deemed abandoned. *Herrmann v. Moore,* 576 F.2d 453, 455 (2d Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *see* Fed.

R.App.P. 28(a)(5). However, Fed.R.App.P. 2 gives a Court of Appeals the discretion to overlook such a failure if manifest injustice otherwise would result. *See United States v. Rivera Pedin*, 861 F.2d 1522, 1526 n. 9 (11th Cir.1988); *United States v. Loya*, 807 F.2d 1483, 1487 (9th Cir.1987); *United States v. Gray*, 626 F.2d 494, 497 (5th Cir.1980), *cert. denied*, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981); *United States v. Anderson*, 584 F.2d 849, 853 (6th Cir.1978). Because, as we now hold, Babwah's consent to the search was tainted, *Matlock, supra*, is not binding authority for the proposition that Babwah's consent precluded Maharaj from contesting the search's legality. *See Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Maharaj has standing to challenge the search because he resided in the house that was searched. *Id.* at 548 n. 11, 88 S.Ct. at 1791 n. 11. Moreover, he was subject to the same unlawful seizure as was Babwah, and the search was the fruit of that seizure. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). The Government will not be prejudiced if we permit Maharaj to adopt the arguments made by Babwah, because it already has had the opportunity to respond to those arguments. *See Gray, supra*, 626 F.2d at 497. Accordingly, we hold that Maharaj's conviction, like Babwah's, must be reversed because of the violation of his Fourth Amendment rights.

We reverse Babwah's and Maharaj's convictions and remand for further proceedings consistent with this opinion.

LUMBARD, Circuit Judge, dissenting:

Because I believe that the evidence obtained at 107th Street was properly admitted at trial, I would affirm the judgment of conviction.

The majority finds that the initial encounter between Babwah, Maharaj, and the customs officials constituted a permissible *Terry*-type detention, but that "by the time they reached 107th Street, some forty minutes after the original stop, the detention of the defendants had lost its identity as a lawful investigatory stop." Therefore, the statements and physical evidence subse-

quently procured by the officials were tainted by this unlawful detention and should have been suppressed prior to trial.

I do not believe that either Babwah or Maharaj were "seized" at any time by the customs officials. As the majority notes, the initial encounter between Babwah, Maharaj, and the agents was a permissible *Terry* stop. During that encounter, Agents Devine and Aryai asked whether Babwah and Maharaj were willing to accompany them to the location at 107th Street. Both defendants consented. At that point the initial investigative detention became a consensual encounter between Babwah, Maharaj, and the customs officials.

It is well settled that there is nothing improper with a consensual encounter between police and potential suspects. *See Florida v. Bostick*, — U.S. —, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *United States v. Springer*, 946 F.2d 1012 (2d Cir. 1991); *United States v. Hooper*, 935 F.2d 484 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); *United States v. Lee*, 916 F.2d 814 (2d Cir.1990). In order to determine whether an encounter is consensual or coercive, the court must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter." *Florida v. Bostick*, — U.S. at —, 111 S.Ct. at 2389. This court has identified various factors that would indicate a seizure, such as "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory ..." *United States v. Hooper*, 935 F.2d at 491.

Here there is nothing to indicate that the consent was not freely given, or that Babwah and Maharaj felt compelled to accompany the officers. Prior to agreeing to accompany the officers to 107th Street, Babwah agreed to allow the agents to search his car; following the ride to 107th Street, Babwah signed a written consent allowing the agents to search his house.

In fact, he initially refused to sign the consent form, as there was empty space between the text of the consent and the line for his signature, and he feared that the officers might add additional language. It is clear, then, that Babwah was willing to consent, but was also unafraid to question the officers' requests. There is no reason to believe that he did not knowingly and willingly consent to accompany the officers to 107th Street. There is similarly no evidence that Maharaj did not willingly consent to ride to 107th Street as well.

Furthermore, throughout the initial encounter Babwah and Maharaj were in no way restrained or intimidated. There were only two officers present; they did not display their weapons and they spoke in conversational tones. Babwah and Maharaj were free to walk around while the agents searched their car. Finally, the officers did not request that they travel in a police car; rather, the officers offered to allow Babwah and Maharaj to drive Babwah's car to the location while agent Devine sat in the rear. Clearly this arrangement would not suggest to the individuals that they were subject to arrest or compelled to acquiesce to the officers' request.

The evidence obtained at the location on 107th Street was properly admitted at trial and the judgment of the district court should be affirmed.