17-1292 (L.)
*United States v. Gomez*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 1st day of October, two thousand eighteen.

PRESENT:

> PIERRE N. LEVAL,
> SUSAN L. CARNEY,
> > *Circuit Judges*,
> KATHERINE POLK FAILLA,
> > *District Judge.*[*]

———————————————————————

UNITED STATES OF AMERICA,

> *Appellee*,

> > v.                                         Nos. 17-1292 (L), 17-1987 (Con)

SANDY GOMEZ, JORGE GOMEZ,

> *Defendants-Appellants.*[†]

———————————————————————

FOR APPELLEE:                              SHAWN G. CROWLEY, Assistant United
                                          States Attorney (Richard Cooper, Patrick

---

[*] Judge Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

[†] The Clerk of Court is directed to amend the caption to conform to the above.

Egan, Daniel B. Tehrani, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

FOR APPELLANTS:                    NATALI TODD, Law Offices of Natali J.H. Todd, P.C., Brooklyn, NY *for Sandy Gomez.*

Appeal from a judgment of the United States District Court for the Southern District of New York (Gardephe, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on June 16, 2017, as to defendant-appellant Sandy Gomez, in No. 17-1987, is **AFFIRMED**.[1]

Defendant-appellant Sandy Gomez ("Gomez" or "Sandy") appeals from the District Court's judgment sentencing him principally to 164 months' imprisonment after a jury convicted him of a single count of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A). Gomez raises many challenges to his conviction and sentence. His primary challenge on appeal, however, arises from his contention that the government's search of a vehicle that he was driving violated his Fourth Amendment rights. The evidence found during that search, he argues, should have been suppressed by the District Court. He argues secondarily that the government failed to establish by a preponderance of the evidence that venue was proper in the Southern District of New York, and that the jury's finding otherwise cannot be sustained. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to reject these arguments and to affirm Gomez's conviction and sentence.

---

[1] The appeal of co-defendant-appellant Jorge Gomez in No. 17-1292 is being separately resolved by a motion order entered today, granting the government's motion for summary affirmance, and granting the motion of counsel for Jorge Gomez, under *Anders v. California*, 386 U.S. 738 (1967), for permission to withdraw.

The following facts are undisputed except where otherwise noted. On December 7, 2014, Sandy Gomez was driving a borrowed vehicle and heading north on Interstate 59 in Louisiana, near New Orleans. He was accompanied in the car by Caronlay Ramon-Baez, the girlfriend of Sandy's brother, Jorge Gomez ("Jorge"), co-defendant here. At around 10:00 pm, Sandy Gomez and Ramon-Baez were pulled over by Louisiana State Police Senior Trooper Ronald Whittaker.

According to Whittaker, who testified at both a suppression hearing and at trial, an agent from the narcotics unit had contacted Whittaker's unit—criminal patrols—a few days before the stop to request assistance in an ongoing DEA investigation based in New Jersey. The DEA agents explained to Whittaker that a vehicle belonging to the DEA was expected to be used to pick up cocaine in New Orleans. The agents gave a description of the vehicle, including make, model, color and license plate number, and informed Whittaker that it contained a secret compartment that would likely be used to conceal the cocaine. The DEA agents asked Whittaker's unit to perform a "walled-off" stop of the vehicle, should he locate it. This meant to him that he should lawfully stop the vehicle, if possible, but while doing so should avoid suggesting that the occupants were under investigation.

Whittaker testified that on December 7, he observed a vehicle matching the description given by the DEA agents driving north on Interstate 59. He observed the vehicle commit two traffic violations—crossing the center line and crossing the fog line—and then pulled the vehicle over. Gomez was driving. Whittaker recounted that he explained to Gomez that he had pulled him over for crossing the fog line.

Whittaker then asked Gomez a series of questions about how long Gomez had been in New Orleans and what he had done while in the city. Whittaker testified that Gomez seemed "extremely nervous" as the conversation proceeded. Gomez told Whittaker that he had been in New Orleans for one day, that he had driven in from New Jersey but had come from North Carolina that day, and that he had watched a football game while in New Orleans. When Gomez was unable to tell Whittaker any details about the game, such as the score, however, he then explained that either the game or his plans had been cancelled.

Whittaker then spoke separately to Ramon-Baez, who was in the passenger seat, who told Whittaker that she and Gomez had come from Alabama (not North Carolina).

Whittaker then asked Gomez if he could search the vehicle, and Gomez verbally agreed. Before proceeding, Whittaker gave Gomez a consent-to-search form that contained both English and Spanish explanations, and Gomez signed the form.

In an initial inspection of the vehicle, Whittaker noticed that the molding around the back seat was a different color than the molding in the rest of the vehicle, which (as Whittaker testified) can be a sign of the presence of a secret compartment or "trap" in a vehicle. Whittaker next requested from his headquarters that a narcotics detection dog be brought to the site. Once arrived, the dog alerted, suggesting the presence of narcotics in the vehicle. Another agent, newly on scene, then located and opened the vehicle's secret compartment, revealing five kilograms of cocaine. Whittaker then arrested both Gomez and Ramon-Baez.

Before trial, Gomez moved to suppress the evidence found in the vehicle, contending that the search violated his Fourth Amendment rights in several ways. In its ruling on the motion to suppress, the District Court first concluded that Gomez, as a renter or borrower of the car, lacked Fourth Amendment standing to challenge the search of the secret compartment. The District Court concluded further that, even if Gomez had such standing, suppression was not warranted because Whittaker had reasonable suspicion to stop the vehicle and then lawfully obtained Gomez's consent to search the vehicle. *See generally United States v. Gomez*, 199 F. Supp. 3d 728 (S.D.N.Y. 2016).

Gomez proceeded to trial and was convicted by a jury. The jury also determined that venue for the prosecution was proper in the Southern District of New York. He now appeals the District Court's denial of his motion to suppress, other evidentiary decisions made by the District Court at trial, the sufficiency of the evidence as to both his crime of conviction and venue, and the reasonableness of his sentence.

I.      *Fourth Amendment Challenge*

On appeal of the denial of a suppression motion, "we review [a district court's] findings of fact for clear error and legal questions *de novo.*" *United States v. Stewart*, 551 F.3d 187, 190-91 (2d Cir. 2009).

Gomez contends that the District Court erred in holding that he lacked standing under the Fourth Amendment to challenge the search of the vehicle's secret compartment. We reject his challenge to the search for other reasons discussed below and therefore do not address the District Court's ruling on standing.

Gomez next contends that Whittaker was not authorized to stop the vehicle because, he asserts, no traffic violation occurred. The District Court found, however, based on Whittaker's testimony, that the vehicle "made contact with the fog line." *Gomez*, 199 F. Supp.3d at 742. This factual finding is not clearly erroneous: Whittaker testified at the evidentiary hearing that he saw the vehicle cross the fog line in violation of Louisiana traffic law. Accepting that Whittaker saw the vehicle cross the fog line, Whittaker could then permissibly pull over the vehicle because "reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *Stewart*, 551 F.3d at 193. Although Gomez briefly suggests that the stop was unlawful because the traffic violation served as a mere pretext for stopping the vehicle, it is established that "[i]f an officer has observed a traffic violation, his actual motivation for stopping the vehicle is irrelevant to whether the stop is constitutionally reasonable." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). This argument thus has no force.

Gomez next urges us to rule that, even if the initial stop was lawful, it ran afoul of the Fourth Amendment because it was unreasonably extended and lasted past the time necessary to complete traffic violation-related tasks such as checking the validity of Gomez's license and registration. A traffic stop may not typically be prolonged beyond the amount of time "reasonably required to complete the stop's mission." *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) (internal quotation marks omitted). A traffic stop "may be extended for

5

investigatory purposes," however, "if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *Foreste*, 780 F.3d at 523.

Here, Whittaker already knew that the DEA agents, based on their ongoing investigation in New Jersey, believed the vehicle and its occupants to be involved in narcotics trafficking. The vehicle that Gomez was driving precisely matched the vehicle description that the DEA agents had given to Whittaker. Whittaker thus knew that the vehicle was owned by the DEA and that it contained a secret compartment. Whittaker also knew that the DEA agents had reason to believe that the occupants had been in New Orleans to pick up cocaine, which they would store in the secret compartment for transportation back to New Jersey. Gomez had told Whittaker that he had driven to New Orleans from New Jersey—the state where the DEA investigation was based—further corroborating the information that the DEA had given to Whittaker. Whittaker thus had reasonable suspicion that the vehicle occupants were engaged in narcotics trafficking even before he made the stop.

Finally, Gomez submits that the written and verbal consents that he gave Whittaker to search were invalid because his detention had already become a *de facto* arrest. If an authorized person, such as the driver of a vehicle, voluntarily gives an officer consent to search an area, then the officer does not need a warrant or probable cause to search that area. *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006). A person's consent is not voluntary, however, if he was subject to a *de facto* arrest before he gave his consent. *United States v. Babwah*, 972 F.2d 30, 33 (2d Cir. 1992).

In determining whether an investigatory stop has ripened into a *de facto* arrest, we consider, *inter alia*, "the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including

6

whether or not handcuffs were used." *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (internal quotation marks omitted).

On consideration of these factors here, we agree with the District Court that they support the conclusion that Gomez was not under *de facto* arrest when he consented to Whittaker's search of the vehicle. Whittaker had used no force against Gomez or Ramon-Baez; only two troopers were present; the stop had lasted only about thirteen minutes before Gomez gave his consent to the search; and neither Gomez nor Ramon-Baez had been hand-cuffed. Although Gomez may have felt that his freedom of movement was constrained because Whittaker had already asked him to step out of the vehicle, he was not physically restrained in any way. Under these circumstances, Gomez was not subject to a *de facto* arrest and his consent was valid. *See United States v. Santillan*, 2018 WL 4038032 at *9 (2d Cir. August 24, 2018) (no *de facto* arrest where traffic stop extended 37 minutes following questioning and driver was placed in back of police car).

We therefore conclude that Gomez's Fourth Amendment rights were not violated by Whittaker's search of the vehicle. Whittaker's observation of a traffic violation was sufficient to justify the initial stop; that stop was not unreasonably prolonged; and Gomez's consents to Whittaker's search were valid.

## II.    *Venue*

Gomez also contends that the government failed to establish that venue for the prosecution was proper in the Southern District of New York and that, accordingly, vacatur is required. Because proper venue is not an element of a crime, "the government must prove its propriety by only a preponderance of the evidence." *United States v. Tang Yuk*, 885 F.3d 57, 71 (2d Cir. 2018). We review *de novo* whether the evidence introduced at trial was adequate to support the jury's finding that venue was proper. *Id.* In doing so after a conviction, we construe that evidence in the light most favorable to the government. *Id.*

In a conspiracy prosecution, venue lies in "any district in which an overt act in furtherance of the conspiracy was committed," if the act was performed "by a conspirator" and "was undertaken for the purpose of accomplishing the objectives of the conspiracy." *Id.*

7

at 69 (internal quotation marks omitted). In the context of a conspiracy, "phone calls from one district to another by themselves can establish venue in either district as long as the calls further the conspiracy." *Id.* at 71 (internal quotation marks omitted).

The government's evidence of venue at trial consisted of one telephone conversation, made on December 3, 2014, in which Jorge (Sandy's brother and co-conspirator) called Antonio Jimenez-Baez (later revealed to be a DEA informant) in the hopes of securing a car with a secret compartment that could contain 50 kilograms of drugs for Sandy Gomez's trip to New Orleans. During this call, Jimenez-Baez told Jorge that he was in Manhattan, although he was in fact physically located in Yonkers, and he agreed to provide Jorge a car with a trap. Both Manhattan and Yonkers are in the Southern District of New York.

Gomez argues that Jimenez-Baez was not credible as to his location because he later acknowledged that many things he told Jorge were lies. On appeal, however, we "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses." *United States v. Dhinsa*, 243 F.3d 635, 648 (2d Cir. 2001). Because the properly instructed jury found that the government proved venue by a preponderance of the evidence, we may infer that the jury credited Jimenez-Baez's testimony about the contents of his conversation with Jorge and Jimenez-Baez's location during that conversation. *See Tang Yuk*, 885 F.3d at 73 n.4 (noting that court must draw inferences in favor of the government after trial). We see no adequate basis for disturbing that judgment.

Gomez also contends that Jorge's call with Jimenez-Baez was "merely preparatory" to establishing contact with Jimenez-Baez, such that it cannot, on its own, support a finding of venue. *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989) (holding that telephone calls that were "merely prior and preparatory to [the] offense" did not establish venue). We have concluded, however, that the use of a single telephone call to further a criminal scheme may be sufficient to establish venue in the context of conspiracy, and the jury was entitled to conclude accordingly. *United States v. Rommy*, 506 F.3d 108, 122-23 (2d Cir. 2007); *see also Tang Yuk*, 885 F.3d at 71. In this case, the acquisition of an appropriately equipped vehicle was an important step in furtherance of the drug conspiracy. The call in which Jorge requested a vehicle with a secret compartment and Jimenez-Baez

8

agreed to provide such a vehicle, was therefore an overt act in furtherance of the conspiracy. We conclude that the government's evidence at trial was sufficient to establish venue in the Southern District of New York.

* * *

We have considered Gomez's remaining arguments and find them to be without merit as to both his conviction and the reasonableness of his sentence. For the reasons set forth more fully above, we conclude that the District Court correctly denied Gomez's motion to suppress because the search of the vehicle did not violate his Fourth Amendment rights, and that the jury was entitled to find that the government adequately established venue in the Southern District of New York. Accordingly, we **AFFIRM** the judgment of the District Court.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court