# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-3092                                    September Term, 2006

04cr00010-01

Filed On: July 12, 2007

United States of America,
            Appellee

        v.

Paul Askew,
            Appellant

BEFORE:        Ginsburg, Chief Judge, and Sentelle, Henderson, Randolph,
               Rogers, Tatel, Garland, Brown, Griffith, and Kavanaugh,
               Circuit Judges, and Edwards, Senior Circuit Judge

## O R D E R

Upon consideration of the appellant's petition for rehearing en banc, the response thereto, and the vote in favor of the petition by a majority of the judges eligible to participate, it is

**ORDERED** that the petition be granted. This case will be reheard by the court sitting en banc. It is

**FURTHER ORDERED** that the court's April 6, 2007 judgment be vacated in its entirety. It is

**FURTHER ORDERED** that oral argument before the en banc court will be heard at 9:30 a.m. on Thursday, October 11, 2007. It is

**FURTHER ORDERED** that the parties submit thirty (30) copies each of briefs and the appendix in accordance with the following schedule:

| | |
|---|---|
| Brief for Appellant | August 17, 2007 |
| Appendix | August 17, 2007 |
| Brief for Appellee | September 10, 2007 |
| Reply Brief for Appellant | September 21, 2007 |

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 04-3092**                    **September Term, 2006**

The briefs should address whether during a <u>Terry</u> stop police officers may unzip a suspect's jacket solely to facilitate a show-up. In addressing this question, the parties should consider whether the officers' action was a lawful search under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and its progeny. The briefing should not extend to the subject covered in Part IV of the panel opinion, <u>i.e.</u>, the "second unzipping".

Because the briefing schedule is keyed to the date of argument, the court will grant requests for extension of time limits only for extraordinarily compelling reasons. The parties are directed to serve and file their submissions by hand. All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover. <u>See</u> D.C. Cir. Rule 28(a)(7).

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Nancy G. Dunn
Deputy Clerk

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 17, 2006　　　Decided April 6, 2007

No. 04-3092

UNITED STATES OF AMERICA,
APPELLEE

v.

PAUL ASKEW,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00010-01)

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender.

*Florence Y. Pan*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese, III*, Assistant U.S. Attorney.

Before: SENTELLE and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Circuit Judge* SENTELLE joins.

Dissenting opinion filed by *Senior Circuit Judge* EDWARDS.

KAVANAUGH, *Circuit Judge*: When the police have reasonable suspicion that a person committed, is committing, or is about to commit a crime, the officers may forcibly stop that individual. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968). During the *Terry* stop, the officers may briefly take certain reasonable investigative steps – including questioning the suspect and conducting identification procedures such as fingerprinting and "show-ups" (in a show-up, the police have a witness or victim look at the suspect). *See Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County*, 542 U.S. 177, 185 (2004); *Hayes v. Florida*, 470 U.S. 811, 817 (1985); *Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981).

In this case, the police learned that an armed robbery had just occurred on a street in Washington, D.C. Shortly afterward, an officer saw Paul Askew walking on a nearby street. Based on reasonable suspicion that Askew had committed the armed robbery, the officer stopped him. The police then brought the robbery victim to the scene of the stop and conducted a show-up. The officers unzipped Askew's outer jacket during the show-up so that the victim could see Askew's clothing – that step, the police believed, could assist the witness's identification. Unzipping the outer jacket ultimately led the officers to discover that Askew was illegally carrying a gun.

Askew's primary argument to this Court is that the initial unzipping of his jacket was an unreasonable search. We

disagree. In a show-up during a *Terry* stop, the Fourth Amendment permits police officers to reasonably maneuver a suspect's outer clothing – such as unzipping an outer jacket so a witness can see the suspect's clothing – when taking that step could assist a witness's identification. We affirm the District Court's judgment.

I

1. The District Court's findings of fact (and, where specific findings are lacking, the relevant testimony from the suppression hearing) show the following. *See United States v. Askew*, 313 F. Supp. 2d 1, 2-3 (D.D.C. 2004).

At about 11 p.m. on December 19, 2003, a Metropolitan Police Department radio broadcast reported an armed robbery near 9th and G Streets, S.E., in the District of Columbia. The radio report in part described the robbery suspect as male, approximately six-feet tall, and wearing a blue sweatshirt and blue jeans. While driving in his patrol car, Officer Anthony Bowman heard the dispatch and began canvassing the area near the robbery scene. Within minutes, Officer Bowman saw Paul Askew walking near 9th Street and Independence Avenue, S.E. Noticing that Askew was a man with a mustache who "vaguely matched" the broadcast description, Officer Bowman asked the dispatcher whether the alleged robber had a mustache. The dispatcher replied that the robbery suspect indeed had been described as having a mustache. Meanwhile, when Askew saw that Officer Bowman's car was following him, Askew turned and walked in a different direction. Officer Bowman continued to follow Askew in the police car.

After calling in his location to other police, Officer Bowman parked the patrol car, got out, and stopped Askew. Officer Bowman requested that Askew present identification

and instructed Askew to keep his hands on top of his head, not in his pockets.  Askew complied with those requests.  Officer Bowman then told Askew that he had been stopped because he matched the description of an armed robbery suspect.  Officer Bowman noticed that Askew was wearing two jackets:  "[H]e had on a navy blue jacket with a darker blue fleece type jacket underneath."

Other police (including Officer Anthony Willis and Officer James Koenig) arrived at the scene.  For the officers' safety, Officer Koenig conducted a standard patdown frisk of Askew's outer clothing pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  Officer Koenig did not feel a weapon.

Another officer then arrived with the robbery victim to conduct a "show-up" procedure (which allows a witness or victim to look at a suspect for identification purposes).  The victim remained inside the police car as the officers brought Askew toward the car.  Officer Willis recalled that the suspect described in the radio broadcast was wearing a blue hooded sweatshirt.  As Officer Willis testified, he wanted the victim to see what Askew had on "to make sure that he wasn't zipping nothing up to cover up."  To that end, Officer Willis started to pull down Askew's outer jacket zipper.  The zipper stopped when it hit what Officer Willis described as a "hard" or "solid" object and "didn't go past" the object.  Askew then knocked Officer Willis's hand away from the zipper.

At about this time, the show-up ended, and the officer accompanying the victim in the car drove her away from the scene of the show-up.  At this point, Officer Willis and Officer Edward Snead were not aware of the results of the show-up.  They quickly walked Askew backward and made him sit upright on the hood of a police car.  (The testimony suggests less than a minute passed between the end of the show-up and the walk to

the police car. *See* Suppression Hr'g Tr. 54-55 (Mar. 10, 2004).) Officer Willis fully unzipped Askew's outer jacket, revealing that Askew wore a black pouch underneath the jacket. The pouch was partially open, and a silver object protruded from it. The police recognized the object as a gun. The police then handcuffed Askew and formally arrested him. Although the record does not specify the grounds for the arrest, District of Columbia law prohibits carrying a pistol without a license. *See* D.C. CODE § 22-4504(a).

In the meantime, the victim informed the officer in the police car that Askew was not the man who had committed the robbery. The record does not specify the precise moment when this occurred, although the officers on the scene did not become aware until some undetermined time after Askew's arrest on the weapons violation. *See* 313 F. Supp. 2d at 3 & n.4 (officer accompanying victim "did not advise Officer Willis and his colleagues whether the complainant had made an identification."); *see also* Suppression Hr'g Tr. 13 (Mar. 26, 2004) (Officer Willis learned results of show-up "after [officers] had handcuffed" Askew); Suppression Hr'g Tr. 54 (Mar. 10, 2004) ([Question to Officer Snead]: "So at least you never heard from [officer accompanying victim] at that time what the results of the show-up were? [Answer]: Not at that time.").

2. Based on Askew's prior felony conviction, the Government subsequently obtained a one-count federal grand jury indictment charging Askew with possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1).

Askew moved to suppress the evidence of the firearm on the ground, among others, that the unzipping of the outer jacket violated the Fourth Amendment and that the gun was the fruit of the constitutional violation. After an evidentiary hearing, the District Court denied the motion. 313 F. Supp. 2d at 1. At the

outset, the District Court concluded that Officer Bowman had the authority under *Terry v. Ohio*, 392 U.S. 1 (1968), to stop Askew – given Askew's proximity to the location of the reported robbery, his physical resemblance to the armed robbery suspect described in the police radio broadcast, and his change of course upon seeing Officer Bowman. *See* 313 F. Supp. 2d at 4. The District Court also concluded that *Terry* authorized Officer Koenig to frisk Askew for potential weapons (the District Court here was referring to the initial frisk that did not disclose Askew's gun). *Id.*

The court held that the partial unzipping of the outer jacket for the show-up procedure was also permissible. *Id.* at 6-7. The court further ruled that, because Officer Willis's partial unzipping of Askew's jacket for purposes of the show-up was constitutional, the Fourth Amendment permitted the officers, after feeling the hard object, to restrain Askew and fully unzip his jacket to determine whether the hard object was a weapon. *Id.* at 5.

Askew entered a conditional plea of guilty, reserving his right to bring this appeal from the District Court's denial of the motion to suppress. *See* Fed. R. Crim. P. 11(a)(2). The District Court sentenced Askew to 36 months of imprisonment and 36 months of supervised release.

On appeal, the parties agree that the Fourth Amendment governs the analysis and that the evidence of the gun must be excluded if we find the search unreasonable. Askew does not challenge the District Court's conclusions that Officer Bowman had reasonable suspicion to stop Askew and that Officer Koenig's frisk of Askew was valid. Askew focuses instead on the conduct of the police during the show-up – in particular, the two unzippings of the outer jacket. We review de novo the District Court's legal conclusion that the search was

constitutional. In doing so, we accept the District Court's findings of fact unless clearly erroneous. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## II

1. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The touchstone of the Amendment is reasonableness, which "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). As the Supreme Court has said, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Under the *Terry* line of cases, the police may forcibly stop a person based upon "reasonable suspicion" that the individual committed, is committing, or is about to commit a crime, "even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). During a *Terry* stop justified by reasonable suspicion, the police may take two kinds of actions: Officers may take reasonable *protective* measures, and they may take reasonable *investigative* measures. To place the issues raised by this appeal in context, we briefly summarize the Supreme Court precedents governing both measures.

*First*, during a *Terry* stop, the police may take reasonable *protective* steps to ensure the safety of the officers and the public. An encounter between a police officer and a potential criminal suspect can be a dangerous situation; thousands of officers each year are assaulted, and in 2005 more than one officer per week was feloniously killed in the line of duty in the

8

United States. The Fourth Amendment does not require police officers to choose between investigating possible criminal activity and avoiding violent attack. On the contrary, courts appropriately give great deference to police officers' interest in safety as they protect the citizenry. As the Court in *Terry* succinctly stated, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("[T]he policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."). Therefore, as the *Terry* Court explained, when an officer stops an individual based on reasonable suspicion and has reason to believe the person may be "armed and dangerous," the officer is authorized to conduct a protective patdown frisk "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26-27; *cf. Chimel v. California*, 395 U.S. 752, 763 (1969) (similar rule for protective searches incident to arrest based on probable cause). So too, because of the heightened danger in *Terry* stops of cars, the police may conduct protective searches for weapons in the passenger compartment of a motor vehicle. *See Michigan v. Long*, 463 U.S. 1032, 1049-52 (1983); *cf. New York v. Belton*, 453 U.S. 454, 457-60 (1981) (similar rule for protective searches of cars incident to arrest based on probable cause).

*Second*, in addition to reasonable protective steps, the police may take reasonable *investigative* steps during a *Terry* stop to determine whether the individual committed, is committing, or is about to commit a crime (in other words, to try to confirm or dispel the reasonable suspicion that justified the stop in the first place). As the Supreme Court has stated, "a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the

person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County*, 542 U.S. 177, 185 (2004); *see Michigan v. Summers*, 452 U.S. 692, 700 n.12 (1981) ("'several investigative techniques . . . may be utilized effectively in the course of a *Terry*-type stop.'") (quoting 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2 pp. 36-37 (1978)).

2.   To resolve this case, we must initially review the Supreme Court's case law analyzing the following key question: What *investigative* steps are permissible and impermissible during a *Terry* stop?

We begin by describing the category of impermissible steps.  A *Terry* stop occurs when the police have "reasonable suspicion" of criminal activity – but the police's justification has not yet risen to the level of "probable cause" needed for an arrest.  Because the police do not yet have probable cause for an arrest, the police during a *Terry* stop may not engage in what the Supreme Court has called a "full search." *Terry*, 392 U.S. at 26; *see id.* at 30 ("general exploratory search for whatever evidence of criminal activity [officer] might find"); *see also Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) ("evidentiary search," namely one raising prospect that officer will "rummage and seize at will" beyond "specific authorization") (internal quotation marks omitted); *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion of White, J.) ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a *full search* of the person or of his automobile or other effects.") (emphasis added).  As the Court has explained, such a "full search" – sometimes called an exploratory or evidentiary search – occurs when the police rummage through a person's pockets, bags, and clothing for contraband the person may be carrying, such as stolen goods, drugs, or other tangible evidence of crime. *See Sibron v. New*

*York*, 392 U.S. 40, 64-65 (1968).

Other than the forbidden "full search," the Supreme Court has held that other investigative steps during a *Terry* stop are permissible if "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *see also Hiibel*, 542 U.S. at 185. The *Terry* "reasonably related in scope" standard is far from self-defining, but the Supreme Court's rulings have provided guidance – permitting "several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop." *Summers*, 452 U.S. at 700 n.12 (quoting 3 LaFave, Search and Seizure § 9.2 pp. 36-37 (1978)). The permissible investigative steps include the following:

• The police may ask questions to the individual who has been stopped. *See Terry*, 392 U.S. at 6-7 ("Officer McFadden approached the three men, identified himself as a police officer and asked for their names."); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) (recognizing police ability to "ask questions, or check identification" during *Terry* stop); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond."); *Terry*, 392 U.S. at 34 (White, J., concurring) ("[T]he person may be briefly detained against his will while pertinent questions are directed to him.").

• When the police have a reasonable basis for believing that a traveler is carrying luggage that contains drugs, the police may seize the luggage "briefly to investigate the circumstances" that give rise to their suspicion, and they may subject the luggage to a dog sniff for narcotics. *United States v. Place*, 462 U.S. 696, 706-07 (1983); *see also Illinois v. Caballes*, 543 U.S. 405, 408-

09 (2005) (allowing dog sniff of motorist's lawfully stopped car).

• The police may obtain fingerprints; in particular, such fingerprinting is authorized "if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with [a] crime, and if the procedure is carried out with dispatch." *Hayes v. Florida*, 470 U.S. 811, 817 (1985).

• A witness show-up is permissible: When it is "known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime." *Summers*, 452 U.S. at 701 n.12 (quotation marks omitted). (Whether the resulting witness identification may be admitted as evidence in a criminal trial is an analytically separate question. *See Manson v. Brathwaite*, 432 U.S. 98, 111-14 (1977); *United States v. Washington*, 353 F.3d 42, 44-45 (D.C. Cir. 2004).)

## III

We apply the above principles to the issues presented by this case. To begin with, we note that there are two separate Fourth Amendment "events" that must be analyzed. The primary and more difficult question in this case concerns the initial unzipping of Askew's jacket. The secondary question is whether, after the initial unzipping revealed a hard object and Askew knocked away the officer's hand, the police's subsequent full unzipping of the jacket was permissible. (We address that secondary question in Part IV below.)

1. Following Officer Bowman's stop of Askew, the police brought the robbery victim to the scene to conduct a show-up for identification. As part of that show-up, Officer Willis partially unzipped Askew's outer jacket so that the victim could see

Askew's "blue fleece type jacket" underneath. 313 F. Supp. 2d 1, 2 (D.D.C. 2004).

The Supreme Court has stated that show-ups are permitted during *Terry* stops. The precise question here, therefore, is whether the added step of unzipping a jacket is permissible when doing so could reasonably assist the witness's identification during the show-up – in other words, whether such a step is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). That reasonableness inquiry weighs the competing interests of the individual and the Government, balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985); *see also United States v. Place*, 462 U.S. 696, 703 (1983).

In conducting the reasonableness inquiry, we consider on one side of the balance the extent to which the challenged investigative step promotes law enforcement aims and protects the public – namely, "the public interest that the crime be solved and the suspect detained as promptly as possible." *Hensley*, 469 U.S. at 229. The unzipping of Askew's jacket clearly promoted the same government interest that justified the show-up itself: the interest in reliably determining whether Askew was the armed robber. A reliable witness identification generally allows the police to determine whether to further investigate or arrest the person stopped, or to move on to someone else entirely. This government interest is particularly important in cases (such as this one) where an armed criminal is at large and may pose a danger of causing additional harm to the public. And the identification is generally more likely to be accurate if the witness can see the characteristics of the person stopped that the perpetrator displayed during commission of the crime. Steps

furthering that interest might include, for example, temporarily removing a hat (so a witness can view hair color or style) or rolling up a shirt sleeve (to reveal a watch or tattoo that had been observed by the witness on the suspect's arm). So too, if a robbery victim says the actual suspect was wearing a certain color shirt underneath a jacket, the police have an interest in unzipping the jacket to allow the victim to see if the individual stopped is wearing such a shirt. This case is no different.

We assess on the other side of the Fourth Amendment balance the extent of the additional intrusion on individual privacy – that is, the additional intrusion caused by unzipping the outer jacket. Here, to begin with, the police did not conduct a "full search," which *Terry* ruled flatly impermissible in a stop based solely on reasonable suspicion. 392 U.S. at 26. In unzipping Askew's jacket, Officer Willis was not conducting a "general exploratory search for whatever evidence of criminal activity he might find." *Id.* at 30. Moreover, the primary intrusions on Askew's individual privacy resulted from the forcible detention itself and the initial protective frisk, both of which were plainly permissible under *Terry*. Our focus therefore is on the *additional* step of unzipping a jacket to reveal clothing underneath. Contrary to Askew's contention, this is a relatively minimal additional interference with individual privacy. The Supreme Court in *Pennsylvania v. Mimms*, for example, authorized officers conducting traffic stops to order the driver out of the car. The Court reasoned that during a valid stop, the "additional intrusion" that leaving the car imposed upon the driver's personal privacy "can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed." 434 U.S. 106, 111 (1977). That provides a fair description of the additional intrusion in this case as well.

Supreme Court precedent helps confirm that the

Government's strong interest in identification of an armed robber outweighs the limited additional intrusion at issue in this case. In particular, in balancing the competing interests of the Government and Askew, we find the Court's decision in *Hayes v. Florida* instructive and important. In *Hayes*, the Court stated that the Fourth Amendment permits the police to take fingerprints during a *Terry* stop; such fingerprinting is legitimate, the Court concluded, "if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with [a] crime, and if the procedure is carried out with dispatch." 470 U.S. 811, 817 (1985).

Here, as in *Hayes*, the police had an objective basis for believing that the identification procedure could "establish or negate the suspect's connection with [a] crime." Here, as in *Hayes*, the police action was "carried out with dispatch." And here, as in *Hayes*, the intrusion fell short of the "full search" that the Supreme Court has prohibited during *Terry* stops. The purposes of the investigative steps at issue here and in *Hayes* are precisely the same (to match the person with a crime that has recently occurred), and the degree of intrusion is similar (indeed, to many people, fingerprinting would seem more intrusive than unzipping an outer jacket).

To be sure, the Supreme Court's reasoning in *Hayes* concerning the validity of brief, in-the-field fingerprinting might be described as dicta. But the Court's analysis obviously was carefully considered; indeed, it was a point of strenuous disagreement between the *Hayes* majority and Justice Brennan in his separate opinion (joined by Justice Marshall). And we have said that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006); *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003); *NRDC v. NRC*, 216 F.3d 1180, 1189 (D.C. Cir.

2000); *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997). That principle comfortably covers the *Hayes* discussion of fingerprinting during *Terry* stops.

In short, the opinion in *Hayes* guides us here. If the police during a *Terry* stop may take fingerprints for identification purposes, it logically follows that the police during a *Terry* stop may unzip an individual's outer jacket for identification purposes (that is, so a witness can see the suspect's clothing).

2. Askew has advanced three arguments why the unzipping of the outer jacket was nonetheless unreasonable.

*First*, Askew notes the possibility of pretext searches: He suggests that some officers would maneuver outer clothing as a pretext for a full search, even though the officers lack probable cause to conduct a full search. The risk of pretextual police behavior has, of course, generated a great deal of concern about *Terry* stops. *See, e.g.*, 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.1(e) p. 279 (4th ed. 2004) ("For many of those who honestly oppose . . . the power of police to stop and frisk, the central point is that police often have utilized street encounters for improper purposes . . . ."); David Rudovsky, *Law Enforcement by Stereotypes and Serendipity*, 3 U. PA. J. CONST. L. 296, 336 (2001) ("[J]ust as the police use the traffic stop to place themselves in a position to search the vehicle and occupants, they use the stop of pedestrians to gain the opportunity to frisk."). The Supreme Court has repeatedly held, however, that the risk of pretextual police behavior does not alter the Fourth Amendment analysis. Instead, the constitutional inquiry focuses on whether the police took protective and investigative steps that were objectively reasonable under the circumstances. In other words, "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren*

*v. United States*, 517 U.S. 806, 814 (1996); *see also Brigham City v. Stuart*, 126 S. Ct. 1943, 1948 (2006); *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

*Second*, Askew advances a slippery slope argument: He contends that upholding the search here necessarily means that extensive body searches or strip searches also would be permitted.  That is simply wrong.  The history of Fourth Amendment jurisprudence is a history of judicial line-drawing as courts assess "reasonableness" by balancing the public's interest in preventing and detecting crime (and thereby maintaining order and public safety) against the individual's interest in privacy.  This case involves the police reasonably maneuvering a suspect's outer jacket during a show-up to assist a witness's identification (by allowing the witness to see the suspect's clothing).  Of course, there are a variety of conceivable searches – such as hypotheticals advanced by Askew – that would be more intrusive than the search at issue here and would more severely affect personal privacy interests.  In such hypothetical cases, the Government would face a heavier burden in showing that the investigative step was "reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20; *cf. Schmerber v. California*, 384 U.S. 757, 769-72 (1966); *Helton v. United States*, 191 F. Supp. 2d 179, 184-85 (D.D.C. 2002).

*Third*, Askew makes a bright-line argument:  He suggests that *Terry* does not permit investigative steps that involve a "search" *of any kind*, no matter how limited.  The initial flaw in this argument is that the Supreme Court has in fact authorized certain intrusive searches during *Terry* stops – so long as they are reasonable under the circumstances and are not what the Court has called a "full search."  *See Terry*, 392 U.S. at 26; *see also Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion of White, J.).  For example, the *Terry* Court itself

17

approved the *protective* step of frisking for potential weapons even though the Court recognized such action was a "serious intrusion" and plainly entailed a "search" within the meaning of the Fourth Amendment. 392 U.S. at 16-17.[*]

And as explained above, the *Hayes* Court endorsed the *investigative* step of on-the-scene fingerprinting – even though compelled fingerprinting is intrusive and triggers independent Fourth Amendment protection, as the Court explained when comparing fingerprinting to "other types of searches and detentions." 470 U.S. at 814. Indeed, in *Hayes* two Justices strongly disagreed with the majority, warning that "on-site fingerprinting (apparently undertaken in full view of any passerby) would involve a singular intrusion on the suspect's privacy, an intrusion that would not be justifiable (as was the patdown in *Terry*) as necessary for the officer's protection." *Id.* at 819 (Brennan, J., concurring in judgment, joined by Marshall, J.). But the position of Justice Brennan and Justice Marshall did not prevail in *Hayes*; had it done so, Askew's bright-line argument here would of course have more force.

Askew's bright-line argument – that an investigative step

---

[*] Given that one side of the Fourth Amendment reasonableness balance looks at the degree of intrusion on the individual, the Supreme Court in certain other areas has similarly distinguished (i) the intrusion caused by so-called full searches from (ii) the lesser intrusion caused by more limited searches. *See Maryland v. Buie*, 494 U.S. 325, 335 (1990) (distinguishing protective sweep, or "cursory inspection" of premises incident to in-home arrest, from "full search"); *United States v. Jacobsen*, 466 U.S. 109, 125 n.28 (1984) ("warrantless search and seizure limited to scraping suspect's fingernails justified even when full search may not be") (citing *Cupp v. Murphy*, 412 U.S. 291, 296 (1973)). In certain other contexts, the Court has held any degree of intrusion unreasonable, noting that "[a] search is a search." *Arizona v. Hicks*, 480 U.S. 321, 325 (1987). *But cf. Buie*, 494 U.S. at 335 n.3 (characterizing *Hicks* as involving police "searching for evidence plain and simple.").

is impermissible if it constitutes a Fourth Amendment search – also contravenes the persuasive views of the leading Fourth Amendment scholar. Professor LaFave has explained that certain "identification searches" do not "require rummaging through a suspect's personal effects as does an ordinary full-blown search." 4 LAFAVE, SEARCH AND SEIZURE § 9.8(b) p. 730 (quotation marks omitted). For that reason, Professor LaFave explained: "Taking fingernail scrapings, for example, *is a search, but yet is a very limited intrusion, and thus should be deemed permissible*" for identification during a *Terry* detention. *Id.* (quotation marks omitted; emphasis added). Professor LaFave's bottom line, therefore, is that certain investigative steps are (and should be) permitted during *Terry* stops even though they constitute "searches" under the Fourth Amendment. Based on the Supreme Court's precedents, we agree.

In sum: Balancing the competing interests and taking our cues from Supreme Court precedent, especially *Hayes*, we conclude that the police during a *Terry* show-up may reasonably maneuver a suspect's outer clothing (such as unzipping an outer jacket so a witness can see the suspect's clothing) when taking that step could assist a witness's identification. In this case, therefore, the Fourth Amendment allowed the police to initially unzip Askew's outer jacket so that the robbery victim could see Askew's clothing, thereby assisting the victim's identification during the show-up. That step was "reasonably related in scope to the circumstances which justified" stopping Askew in the first place. *Terry*, 392 U.S. at 20.

IV

Askew argues that, even assuming the first unzipping was permissible, the second unzipping was impermissible. The District Court rejected that argument, concluding: "If it was

constitutional for Officer Willis to unzip the jacket in the course of the show-up, the later investigation to determine whether the hard object was a weapon certainly was constitutional." 313 F. Supp. 2d 1, 5 (D.D.C. 2004). We agree with the District Court.

To review: The first unzipping of the outer jacket occurred during the show-up itself. During that unzipping, Officer Willis discovered that Askew had a hard object underneath the jacket zipper, and Askew knocked Officer Willis's hand away from the zipper. The show-up ended, and the officer accompanying the victim in the car drove her away from the scene. At this point, the officers remaining with Askew were not yet aware of the results of the show-up. Shortly thereafter, based on the hard object underneath the jacket and Askew's knocking away Officer Willis's hand, the officers walked Askew over to a police car, made him sit up on it, engaged in a second (and this time complete) unzipping of the jacket, and seized a gun found on Askew's person.

We conclude that the second unzipping was justified on any of three alternative grounds. First, it was justified as a *protective* step as part of the *continuing Terry* stop for suspicion of armed robbery. Second, it was justified as a *protective* step to prevent the possibility of armed violence while the police disengaged at the *conclusion* of that *Terry* stop. Third, it was justified because the initial unzipping gave the officers reasonable suspicion to detain and investigate Askew for a new crime – carrying a dangerous weapon in public in violation of District of Columbia law.

*First*, the developments during the initial unzipping – Officer Willis discovering a hard object underneath Askew's jacket in the initial unzipping and Askew knocking away Officer Willis's hand – justified the officers in believing that Askew may have been "armed and presently dangerous." *Terry v. Ohio*, 392

U.S. 1, 30 (1968). Under Supreme Court precedent, these facts entitled the officers to take the protective step of unzipping Askew's jacket in full and seizing the weapon. *See Adams v. Williams*, 407 U.S. 143, 146, 148 (1972) (officer's "reaching to the spot" where driver was said to have been hiding gun to remove it was "limited intrusion designed to insure [the officer's] safety"; "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to [the] protective purpose.") (footnote omitted); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (bulge in driver's jacket allowed officer to conclude driver "was armed and thus posed a serious and present danger to the safety of the officer," authorizing search).

That Officer Koenig had not felt a weapon in conducting the earlier pat-down frisk did not prevent the officers from acting on the new information at this point. The Fourth Amendment does not impose a rigid "one-frisk" rule requiring officers to ignore new information that might lead them to realize that an initial frisk was an inadequate safeguard. *See United States v. Osbourne*, 326 F.3d 274, 278 (1st Cir. 2003) (reasonableness of second or subsequent protective step is "determined under a standard that takes account of the fact that context is vital") (internal quotation marks omitted).

It bears mention, moreover, that the officers involved in the second unzipping did not yet know the results of the show-up procedure when they conducted that second unzipping. On the contrary, as the District Court found, only after Askew's formal arrest on the gun charge did these officers on the scene learn Askew had not been identified by the victim as the armed robber. *See* 313 F. Supp. 2d at 3 n.4 (officer accompanying victim "did not advise Officer Willis and his colleagues whether the complainant had made an identification."). In a fast-moving and

inherently dangerous *Terry* stop, we think it entirely reasonable for officers on the scene to continue to protect their safety, and the public's safety, until these officers themselves know that the initial basis for the stop has dissipated (at least so long as there is not unreasonable delay in obtaining that information). *Cf. United States v. Brown*, 334 F.3d 1161, 1166 n.2 (D.C. Cir. 2003) (in assessing reasonable suspicion and fear of danger, "this court cannot take into account . . . facts . . . not known to the investigating officers at the time of the search," including facts complainant never told officers conducting search and facts suspect later told another officer). Here, moreover, the police acted promptly; they did not continue to hold Askew for an unreasonably lengthy period of time, as may have occurred, for example, in *United States v. Babwah*, 972 F.2d 30, 33 (2d Cir. 1992). In short, the officers here still had justification for holding Askew when they conducted the second unzipping, and the second unzipping was thus a reasonable protective step under *Terry*.

*Second*, even if the reasonable suspicion of armed robbery had dissipated before the second unzipping, the police in any event could take steps to protect themselves while disengaging from the encounter with Askew. In *Michigan v. Long*, the Supreme Court held that, during a *Terry* stop of a driver, the Fourth Amendment allows officers to conduct a protective search of the car's passenger compartment based on reasonable fear that the driver poses a danger. 463 U.S. 1032, 1045-52 (1983). One rationale for this holding was the Supreme Court's concern that absent a protective search, at the end of the *Terry* stop, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1052. It follows that a *Terry* protective search of the person or vehicle is a proper response to fear not only that a suspect might use a weapon during the *Terry* stop, but also that the suspect might use a weapon after the stop ends and before the

police have disengaged. So too here: Had the police not unzipped the jacket a second time to identify and remove the weapon and instead permitted Askew to leave, Askew would have had access to that weapon as the officers departed. As this Court has recognized, *Long* teaches that it is "appropriate to conduct a *Terry* search to ensure that such access would not endanger the lives of the departing officers." *United States v. Christian*, 187 F.3d 663, 671 (D.C. Cir. 1999); *see id.* at 665, 669-671 (protective search of suspect's car reasonable when suspect stood next to car with six-inch bladed dagger by driver's seat visible through partially open window). Askew's argument, in other words, "misunderstands the nature of the protective search; the fear of a person's gaining immediate control of weapons does not limit itself to the time of the stop, but extends through the entire interaction between him and the officer." *United States v. Wallen*, 388 F.3d 161, 166 (5th Cir. 2004). A protective search is therefore justified in a case where "a reasonable officer would . . . be concerned about the ever-present possibility of violent interaction when the suspect[] [was] released at the conclusion of the investigatory stop." *United States v. Holmes*, 376 F.3d 270, 278 (4th Cir. 2004).

*Third*, even assuming the officers no longer had justification to hold Askew on suspicion of armed robbery when they conducted the second unzipping, the second unzipping was constitutional for yet another reason: Once the officers discovered the hard object during the show-up and Askew knocked Officer Willis's hand away in response to the discovery, the officers had reasonable suspicion that Askew was committing a crime *distinct from armed robbery* – namely, carrying a dangerous weapon in violation of District of Columbia law. District of Columbia law provides: "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon

capable of being so concealed." D.C. CODE § 22-4504(a). The police officers reasonably believed that a hard object carried underneath a jacket could be a dangerous weapon. From the fact that Askew knocked away Officer Willis's hand, the officers could also reasonably infer that Askew was attempting to conceal a weapon. *See Terry*, 392 U.S. at 21 (officers must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" their action). Based on the reasonable suspicion that Askew was carrying a concealed weapon, the officers acted well within Fourth Amendment bounds in seizing the weapon: "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to [the] protective purpose." *Adams*, 407 U.S. at 146 (footnote omitted). During a *Terry* stop, when the officers feel or observe an object that might be a weapon, or develop reasonable suspicion that the suspect may be carrying a weapon in a specific place on his person or in his car, the police may seize the weapon. *See id.* at 146, 148; *United States v. Holmes*, 385 F.3d 786, 790-91 (D.C. Cir. 2004) (Roberts, J.) (officer reasonably removed from suspect's outer coat pocket a "hard, square object"); *see also United States v. Harris*, 313 F.3d 1228, 1237 (10th Cir. 2002) ("If the officer discovers what he believes to be a weapon, he may reach inside the suspect's clothing and remove it.") (citing *Adams*, 407 U.S. at 148); *United States v. Swann*, 149 F.3d 271, 272, 276-77 (4th Cir. 1998) (officer reasonably removed hard, rectangular object from suspect's sock).

On any of these three alternative grounds, we reject Askew's claim that the second unzipping was unreasonable.

V

Because the first and second unzippings were both

reasonable, the gun seized from Askew was admissible evidence. That principle is, of course, settled: When taking permissible protective and investigative steps during a *Terry* stop, the police may come across contraband or evidence that the police could not have searched for directly; in such cases, the evidence nonetheless may be seized and used in a criminal prosecution of the suspect. *See Michigan v. Long*, 463 U.S. 1032, 1050 (1983); *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968).

For purposes of clarity, we also identify two questions that we need not and do not reach in this case. First, because we conclude that the initial unzipping of the jacket was a reasonable step during the show-up, we do not decide whether the police even without a witness present could reasonably maneuver a suspect's outer clothing, such as unzipping an outer jacket to see the suspect's clothing, when necessary for identification purposes. Second, because the Government has not pressed the point, we also do not consider whether the police could have justified the initial unzipping of Askew's jacket as a *protective* step and not just as an *investigative* step: Several federal courts have approved initial frisks that go beyond a patdown of outer clothing when necessary to ensure that the person stopped is in fact not carrying a weapon. *See United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003); *United States v. Baker*, 78 F.3d 135, 138 (4th Cir. 1996); *United States v. Thompson*, 597 F.2d 187, 191 (9th Cir. 1979).

\* \* \*

We affirm the judgment of the District Court.

*So ordered.*

EDWARDS, *Senior Circuit Judge*, *dissenting*.

### THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### FIRST PRINCIPLE

"The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries." *Sibron v. New York*, 392 U.S. 40, 64 (1968).

### A SIMPLE TRUTH

*A police officer may not detain a person on the street and, with no probable cause or warrant, insist that the person remove his or her clothing; nor, in these circumstances, may the officer undo the person's clothing without his or her consent. If this is not the law, then the Fourth Amendment is a dead letter in our Constitution.*

---

This appeal is about a citizen's right to enforce Fourth Amendment protections against unlawful searches of his person. The case is important, because, as is clear from the argument presented to this court, the Government seeks to wreak havoc with the law under the Fourth Amendment. The majority holds that, following a *Terry* stop and a protective pat down that produces nothing, police officers may – without probable cause or a warrant – *search* a suspect, not for self-protection, but solely to facilitate an "investigation." Because this holding reflects an extraordinary departure from well-established Supreme Court precedent, I respectfully dissent.

## I. THE FACTS

The facts in this case, which are largely undisputed, are set forth in the District Court's opinion. *See United States v. Askew*, 313 F. Supp. 2d 1 (D.D.C. 2004). The material facts bear repeating here, if only to show precisely how the Government seeks to strip the Fourth Amendment of content.

On the night of December 19, 2003, around 11:00 p.m., a radio run alerted Officer Anthony Bowman of the Metropolitan Police Department to a report of an armed robbery in the 700 block of 9th Street, S.E., in Washington, D.C. Officer Bowman canvassed the area in his patrol car, looking for individuals matching the description of the perpetrator: a black male, approximately six-feet tall, wearing a blue sweatshirt and blue jeans. The radio report reflected that the perpetrator had been last seen moving on 9th Street, S.E., in an unknown direction.

. . . [W]ithin approximately ten minutes of the robbery, Officer Bowman spotted defendant Paul Askew walking in the 200 block of 9th Street, S.E., five blocks from the scene of the robbery. . . . While the description of the perpetrator mentioned a blue sweatshirt and blue jeans, Officer Bowman testified that the defendant was wearing blue sweatpants, "a navy blue jacket[, and] a darker blue fleece type jacket underneath. He had on two jackets." Officer Bowman reported to the dispatcher that Askew "vaguely match[ed] th[e] description." After noticing that the defendant had a moustache, Officer Bowman checked with the dispatcher to determine whether the robber also had a moustache. When the dispatcher responded affirmatively, Officer Bowman stopped the defendant.

Officer Bowman asked the defendant to come to the patrol car, and he complied. The defendant also complied with Officer Bowman's further requests that he produce

some identification, take his hands out of his pockets, and place his hands on the top of his head. Officer Bowman then told the defendant that he was being stopped because of his physical similarity to the description of a robber. When back-up units arrived, Officer Bowman returned to the interior of his car to check whether the police department computer returned any information on the defendant. . . .

Officer James Koenig conducted a pat-down of the defendant and found nothing.[FN 2]

> [FN 2] . . . The government acknowledges that when Officer Koenig patted the defendant down, he did not find anything. The subsequent discovery of the gun at issue here was not the result of this pat-down.

Shortly afterwards, another officer, Officer Benton, drove the robbery victim to the place where the defendant was being detained, for the purpose of conducting a show-up. The victim remained in the car while Officer Koenig and Officer Anthony Willis brought the defendant to a place where he could be seen by the victim. The defendant was not in handcuffs at that time. Preparatory to the show-up, Officer Willis attempted to unzip the defendant's outer jacket to reveal the sweatshirt underneath so the victim could better determine if the defendant was the robber. Officer Willis testified that he remembered the "blue hooded sweatshirt" described in the radio run and "wanted the complainant to see what [the defendant] had on to make sure that he wasn't zipping nothing up to cover up. So I went to unzip it down so that . . . they could see what he had on." Officer Willis had difficulty, however, in unzipping the jacket when the zipper hit what he described as a "hard" or "solid" object and "didn't go past [the object]. It stopped there. And at that time, that's when [the defendant] knocked my hand down," away from the zipper.

After the show-up, Officer Willis and Officer Edward Snead walked the defendant backwards toward the car, placed him on the hood of the car, and unzipped his jacket. Visible once the jacket was unzipped was an open black waist pouch, or "fanny pack," with a silver object sticking out. On further inspection, the silver object was identified as a gun, and the defendant was handcuffed and arrested.

*Id*. at 1-3 & n.2 (internal citations and footnotes omitted).

_____

In reviewing the District Court's findings, there are several important points that are worth highlighting:

- The police requested Askew's identification, which he produced without protest. The police next conducted a lawful *Terry* pat-down search, to determine whether Askew posed a danger to the officers on the scene. *See Terry v. Ohio*, 392 U.S. 1 (1968).

- The police officers' pat down of Askew produced nothing.

- The police then brought Askew in front of the robbery victim and, without his consent and with no fear of danger, an officer partially opened Askew's jacket to display what he was wearing underneath.

- The robbery victim who was brought to the scene for the show-up did not identify Askew as the perpetrator of the crime.

- Following the pat down and the show-up, the police officers no longer had reasonable suspicion to detain Askew pursuant to *Terry*, and they did not have probable cause or a warrant to further detain, arrest, or search him.

- However, after the show-up, when they had no reasonable suspicion and no probable cause, the officers continued to detain Askew against his will. As the District Court found: "Officer Willis and Officer Edward Snead walked the defendant backwards toward the car, placed him on the hood of the car, and unzipped his jacket." *Askew*, 313 F. Supp. 2d at 3.

- The officers found a gun on Askew's person only after they unzipped his jacket without his consent.

---

It is important to emphasize here that the police officers engaged in two separate acts of unzipping Askew's jacket. And in each instance, the officers acted without Askew's consent. The first search occurred when an officer partially unzipped the jacket to reveal Askew's sweatshirt to the robbery victim who was at the show-up. *See id.* at 4-5; Tr. of Motions Hr'g 8-10, Mar. 26, 2004 (Officer Anthony Willis describing two distinct unzippings of Askew's jacket); Br. for Gov't at 5-6 (describing two distinct unzippings). The second search occurred after the show-up was completed, and it was done to determine whether Askew had contraband on his person. *Askew*, 313 F. Supp. 2d at 4-5; Tr. of Motions Hr'g 18-20, Mar. 26, 2004; Br. for Gov't at 6. Thus, the second unzipping could not have facilitated the show-up, because it did not occur until "after the show-up procedure had ended." Br. for Gov't at 6.

6

## II. THE GOVERNMENT'S ARGUMENT

During oral argument, counsel was asked to explain how the Government could justify the officers' searches of Askew's person without reasonable suspicion, probable cause, or a warrant. The Assistant United States Attorney's exchange with a member of the court is illuminating:

> *JUDGE: Is there a single case in the history of the United States [issued by either a] Court of Appeals [or the] Supreme Court, that says [that an officer may], post pat down, having found nothing [during the pat down,] get into [the defendant's] clothing either by unzipping it, unbuttoning it, or removing it under* Terry*. Is there a single case that says that?*
>
> *. . . .*
>
> *AUSA: There might not be a case directly on point as a show-up procedure if you've already had a pat down.*

Although the Assistant United States Attorney grudgingly acknowledged that she could cite no case law to support the officers' search of Askew, she still went on to amplify an astonishing view of the Fourth Amendment on behalf of the Government:

> *JUDGE: Suppose [the officers] know from the [dispatcher's] report that the [robbery suspect] wasn't wearing a whole lot [and] a tattoo was clearly seen [on] her or his top of the chest.*
>
> *. . . .*
>
> *JUDGE: Then the officers say [to the suspect], "Remove your clothing."*
>
> *AUSA: They might be able to do that under the totality of the circumstances.*
>
> *JUDGE: Really? Wow.*
>
> *AUSA: Yes.*

*JUDGE: Under the Fourth Amendment, [an officer can require a person to remove his or her clothing], with no probable cause? . . . That's the Government's position? No probable cause, pat down produces nothing, and under* Terry *[an officer] can say to someone on the street, "remove your clothes?"*

*AUSA: Under the totality of the circumstances, it's a –*

*JUDGE: Wow.*

*AUSA: It may be . . . feasible.*

This is the Government's theory of this case. And, as counsel initially indicated, there is no case law to support this stunningly dangerous reading of the Fourth Amendment. Indeed, later in her oral argument, counsel appeared to understand the breathtaking sweep of the Government's position:

*JUDGE: [In the hypothetical that we were discussing earlier], we know there is a tattoo on [the] skin [of] the person [who has been detained], so [the officers can] start removing clothes?*

*AUSA: Well, maybe under the totality of the circumstances it would not be reasonable to remove his clothes.*

The Assistant United States Attorney was surely correct in offering this belated concession that it would not be reasonable for an officer to remove clothes. It is quite clear under Fourth Amendment law that it is not reasonable for an officer to detain a person on the street and then, *with no probable cause or warrant*, insist that the person remove his or her clothing or, even worse, undo the person's clothing without his or her consent.

### III. THE CONTROLLING LEGAL PRINCIPLES

Almost 60 years ago, the Supreme Court reminded us that the Fourth Amendment's

> guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike. It marks the right of privacy as one of the unique values of our civilization and, with few exceptions, stays the hands of the police unless they have a search warrant issued by a magistrate on probable cause supported by oath or affirmation. And the law provides as a sanction against the flouting of this constitutional safeguard the suppression of evidence secured as a result of the violation . . . .

*McDonald v. United States*, 335 U.S. 451, 453 (1948). These fundamental precepts have not faded with time. Just this past Term, the Court again made it clear that "'[w]arrants are generally required to search a person's home *or his person* unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1947 (2006) (emphasis added) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)).

"Beginning with *Terry v. Ohio*, 392 U.S. 1 (1968), the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt County*, 542 U.S. 177, 185 (2004) (internal alterations, citations, and quotation marks

omitted). *Terry* authorizes "protective searches." *Terry* does not, however, authorize other searches as being within a class of "steps to investigate further." Rather, *Terry*

> held that when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a patdown search to determine whether the person is in fact carrying a weapon. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. Rather, a protective search – permitted without a warrant and on the basis of reasonable suspicion less than probable cause – must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.

*Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (internal alterations, citations, and quotation marks omitted).

The Government argues that the disputed searches in this case were permissible, because they were only "minimally intrusive" and "taken for the sole and legitimate purpose of facilitating the show-up procedure." Br. for Gov't at 18. The majority agrees, holding that a show-up authorizes investigative searches which are to be assessed according to a balancing test.

This is not the law. The Court's rationale in support of the decision in *Terry* always has been that "there must be a narrowly drawn authority to permit a reasonable search for weapons *for the protection of the police officer*, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest

the individual for a crime." *Terry*, 392 U.S. at 27 (emphasis added).

The majority cites a number of cases in an attempt to create an exception to or gloss on *Terry* that gives police officers authority to search a suspect in furtherance of a show-up during a *Terry* stop. Were such an exception to be indulged, it would inevitably swallow the Court's holding in *Terry*. The meaning of *Terry* and its very limited scope are clear:

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron*, 392 U.S. at 64. And nothing in the cases the majority relies upon changes the basic requirements of *Terry*. *Terry* allows only limited "protective searches," not "investigative searches."

## IV. THE OFFICERS' UNZIPPINGS OF ASKEW'S JACKET WERE "SEARCHES"

The Government does not dispute that the officers' unzippings of Askew's jacket were "searches" under the Fourth Amendment. This is unsurprising, because the Court in *Terry* made it clear that even a "frisk" rises to the level of a "search" that is within the purview of the Fourth Amendment. The Court said:

> [I]t is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an

attempt to find weapons is not a "search."  Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity."  It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

*Terry*, 392 U.S. at 16-17 (internal footnotes omitted); *see also Sibron*, 392 U.S. at 45 (officer's "thrust[ing] his hand into [the suspect's] pocket, discovering several glassine envelopes, which, it turned out, contained heroin" was an illegal search).

## V.  THE OFFICERS' UNLAWFUL UNZIPPING OF ASKEW'S JACKET DURING THE *TERRY* STOP

Askew first contends that his Fourth Amendment rights were violated when the officers partially unzipped his jacket during the show-up:

On reasonable suspicion that criminal activity may be afoot and that the suspect may be armed and dangerous, police officers may briefly detain the person and may conduct a limited pat-down search of the suspect's outer clothing for weapons.  The police officer violated the Fourth Amendment here when, after the pat-down search failed to reveal any weapon, he unzipped Mr. Askew's jacket during a show-up procedure for the purpose of revealing to the victim what was underneath.  The district court erred when it held the search did not implicate the Fourth Amendment at all because it occurred during a show-up identification procedure.

Appellant's Br. at 8.  Appellant is correct in what he asserts.  The partial unzipping of Askew's jacket constituted a warrantless search; and the search was unlawful because it did not adhere to the requirements of the Fourth Amendment.

The majority argues that the Government's interest in identification of an armed robber tends to outweigh the intrusion on privacy at issue in this case. This is not the test to determine the legality of a *search* during a *Terry* stop. Rather, the only search authorized by *Terry* is a "protective search" which "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Dickerson*, 508 U.S. at 373 (internal quotation marks omitted). *Terry* does not authorize police officers to search the person of a suspect without a warrant solely to facilitate a show-up investigation. As Government counsel conceded, no federal appellate court has ever held that police officers can continue to search a suspect after a *Terry* pat-down search produces nothing. "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.*

The majority then suggests that the officers' partial unzipping of Askew's coat was permissible because it was not a "full search." There is no less-than-a-full-search exception to *Terry*. Indeed, the *Terry* decision categorically rejects talismanic distinctions between a so-called "full-blown search" and conduct short of it. 392 U.S. at 19. The Court was even clearer in *Arizona v. Hicks*, 480 U.S. 321 (1987), rejecting the suggestion that only victims of "full-blown" warrantless searches deserve protection under the Fourth Amendment:

> [The] dissent suggests that we uphold the action here on the ground that it was a "cursory inspection" rather than a "full-blown search," and could therefore be justified by reasonable suspicion instead of probable cause. As already noted, a truly cursory inspection – one that involves merely looking at what is already exposed to view, without disturbing it – is not a "search" for Fourth Amendment purposes, and therefore does not even require reasonable suspicion. We are unwilling to send police and judges into

> a new thicket of Fourth Amendment law, to seek a creature of uncertain description that is neither a "plain view" inspection nor yet a "full-blown search."

*Id.* at 328-29. Under the Fourth Amendment, "[a] search is a search, even if it happens to disclose nothing [of any great personal value to the suspect]." *Id*. at 325. And if a search done pursuant to a *Terry* stop does not satisfy the strictures of *Terry*, then it is illegal. The Court has noted time and again that "[t]he sole justification of the search in [a *Terry* stop and frisk] situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.

In an effort to employ a balancing test with a *de minimis* exception for less than full-blown investigative searches, the majority is faced with the task of trying to find support for its claim that *Terry* allows more than just "protective searches." This is an impossible task, because the law is not what the majority claims.

The majority first suggests that the strictures of *Terry* can be modified if necessary to facilitate a show-up procedure. But this supposition finds no support in the case law, and neither the majority nor the Government cites a single Supreme Court or Court of Appeals decision endorsing this view. The majority cites *Michigan v. Summers*, 452 U.S. 692, 701 n.12 (1981), in support of the proposition that a witness show-up may be permissible in some circumstances. But *Summers* does not say that police officers may *search* a suspect solely to facilitate a show-up. The requirements of *Terry* remain inviolate even during a show-up, and there is no case that says otherwise. This explains why Government counsel backpedaled during oral argument from first asserting that a police officer can insist that a suspect take off her clothing during a *Terry* stop to facilitate a

show-up, to a concession that, "[w]ell, maybe under the totality of the circumstances it would not be reasonable to remove . . . clothes."

The majority also contends that, because police officers may take reasonable investigative steps during a lawful *Terry* stop, it necessarily follows that they may search a suspect solely to facilitate a show-up. The majority cites *Hiibel*, apparently to suggest that the decision somehow carves out an exception to the rules governing *Terry* stops. There is nothing in *Hiibel* to support this reading of the decision. *Hiibel*'s reference to "investigate further" certainly was not meant to loosen *Terry* from its moorings. *Hiibel* says that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." 542 U.S. at 186. But it does not say that a police officer may *search* a suspect's person solely to facilitate a show-up. As the Court made clear in *Dickerson*, police officers may not use a *Terry* stop to conduct an "evidentiary search that *Terry* expressly refused to authorize." 508 U.S. at 378. Officers may not "rummage and seize at will" during a *Terry* stop. *Id.* It is noteworthy that the Government does not cite *Hiibel* at all, much less for the proposition that it creates an investigative-search gloss on *Terry*.

In amplifying on investigative techniques that may be utilized during *Terry* stops, the majority additionally cites *United States v. Hensley*, 469 U.S. 221, 228 (1985). But this case does not hold that police officers may *search* a suspect solely to facilitate a show-up. In *Hensley*, the Court merely holds that, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* at 229. Nothing in *Hensley* even hints that police officers may conduct an *investigative search* of a suspect's person during a *Terry* stop. The *Hensley* Court simply confirms that

police officers are "authorized to take such steps as . . . reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop," *id.* at 235, which of course is the rationale underlying *Terry*. The *Hensley* decision also notes that the "police [are] entitled to seize evidence revealed in plain view in the course of [a] lawful [*Terry*] stop," *id.*, but this is a far cry from saying that a warrantless search is permissible under *Terry* after a lawful pat down has given the officers no cause for concern over their safety.

For want of any authority endorsing the legality of the officers' search of Askew during the show-up, the majority looks to the Supreme Court's decision in *Hayes v. Florida*, 470 U.S. 811 (1985), for support. Indeed, the portion of the majority opinion upholding the officers' first unzipping of Askew's jacket appears to rest almost entirely on *Hayes*. This is unfathomable.

*Hayes* involved a situation in which the petitioner was the principal suspect in a burglary-rape. The police went to petitioner's home to obtain fingerprints. When petitioner expressed reluctance to accompany officers to the station house, one officer said that they would arrest him. Petitioner replied that he would rather go to the station than be arrested. He was then taken to the station and fingerprinted. When it was determined that his prints matched those taken at the scene of the crime, he was arrested. The Supreme Court found that, because there was no probable cause to arrest petitioner, no consent to the journey to the police station, and no prior judicial authorization for detaining him, the investigative detention at the station for fingerprinting purposes violated petitioner's rights under the Fourth Amendment. The majority gives *Hayes* new meaning, however, claiming that the case stands for the proposition that the Fourth Amendment permits the police to

take fingerprints during a *Terry* stop. This is not what *Hayes* says. Rather, the Court in *Hayes* held that

> the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Id.* at 816. Following this holding, the opinion goes on to say, in passing, that "[n]one of the foregoing implies that a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause, *is necessarily impermissible* under the Fourth Amendment." *Id*. (emphasis added).

The Supreme Court has *never* held that fingerprinting during a *Terry* stop is lawful, neither in *Hayes* nor in any other decision. And, in the 22 years since *Hayes* was decided, the fingerprints comment upon which the majority relies so heavily in this case has never been invoked by the Court. One need only look at the Court's decision in a case like *Minnesota v. Dickerson* – decided eight years after *Hayes* – to understand that the comment in *Hayes* has been of no moment to the Court, and that it certainly has not altered the analytical framework governing cases involving *Terry* stops. It is also noteworthy that the Government's brief relegates *Hayes* to a "*cf.*" citation, with the following cryptic parenthetical: "(suggesting that 'brief detention in the field for the purpose of fingerprinting' *may be permissible* 'where there is only reasonable suspicion not amounting to probable cause')." Br. for Gov't at 20 (emphasis added). This is unsurprising, because no good authority has ever attributed so much to *Hayes* as does the majority here. To say

that reliance on *Hayes* is a reach is an understatement, which may be why the majority appears to go out of its way in attempting to explain how *Hayes* governs the judgment in this case.

The simple, uncontested point here is that there is no worthy precedent supporting the Government's claim that a police officer may *search* a suspect's person solely to facilitate a show-up during a *Terry* stop. And, neither *Hayes*, *Hiibel*, *Hensley*, *Summers*, nor any other decision issued by the Court offers any support for the majority's investigative-search gloss on *Terry*. As Government counsel conceded during oral argument, there is no case under the Fourth Amendment that allows an officer to detain a person on the street and then, with no reasonable suspicion, probable cause, or warrant, to undo the person's clothing, searching the person without his or her consent. Warrantless searches during *Terry* stops are appropriate in only *one* circumstance – where officers, though lacking reasonable cause for arrest, must search for weapons to ensure their own safety. *Michigan v. Long*, 463 U.S. 1032, 1049-50 n.14 (1983). *Terry* does not otherwise condone the physical search of a person. In other words, the only search allowed during a *Terry* stop is a "protective search" that is demonstrably necessary for the discovery of weapons. There is no such thing as an investigative search under *Terry*. *See Dickerson*, 508 U.S. at 373 ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.").

In the instant case, the officers had no basis to conduct a search of Askew's person by partially unzipping his jacket. The pat down did not reveal a gun, so the officers had no grounds to fear for their safety. The *sole justification* for a search following a *Terry* stop and frisk is the protection of police officers and others who are nearby. If the frisk or pat down produces nothing, then the officers have no reason to be concerned about

their safety or the safety of others nearby. When Askew pushed the officer's hand away from the zipper on his jacket, he was merely giving vent to his Fourth Amendment right to avoid an unwarranted search of his person. He had already been frisked, so the officers were not entitled to pursue a further search of his person. *Terry* and its progeny make it clear that the officers were forbidden from attempting to partially unzip Askew's coat without his permission, which they neither sought nor received.

At bottom, the majority's decision rests almost entirely on its interpretation of *Hayes*. As the majority sees it, *Hayes* allows the police during a *Terry* stop to take fingerprints for identification purposes, so it follows that the police during a *Terry* stop may unzip an individual's jacket for identification purposes. This is very much akin to the argument advanced by Government counsel that, if police officers are told that a suspect has a tattoo on her chest, the officers during a *Terry* stop may order the suspect to remove her clothing for identification purposes. Neither *Hayes* nor any other Supreme Court decision supports this extraordinary view of the Fourth Amendment.

"Before [a police officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *Sibron*, 392 U.S. at 64. The officers discovered nothing during their pat down of Askew and thus had no "reasonable grounds to believe that [he] was armed and dangerous." *Id*. at 63. Therefore, when they acted to partially unzip his coat without a warrant, without probable cause, and without consent, their initial search of Askew violated the Fourth Amendment.

## VI. THE OFFICERS' UNLAWFUL SEARCH OF ASKEW AFTER THE SHOW-UP HAD ENDED

Because it is clear that the police officers violated Askew's Fourth Amendment rights when they partially unzipped his jacket during the show-up, there is nothing more that need be decided. There is no dispute over the fact that the police officers never would have uncovered the gun but for their initial search of Askew. Therefore, the District Court should have granted Askew's motion to suppress on this ground alone. Nonetheless, Askew presses the claim that his Fourth Amendment rights were additionally violated when the officers unzipped his jacket after the show-up was completed:

> Although the seizure and the pat-down were justified by a reasonable suspicion that Mr. Askew resembled the robber, the reasonable suspicion, tenuous to begin with, was dissipated by the additional information: the pat down did not reveal a gun, and the show-up procedure did not result in a positive identification of Mr. Askew as the robber. Taking all the circumstances together, the officers' particularized and objective basis for suspecting the particular person stopped of criminal activity had vanished. At that point, there was no basis for further detention. The officers knew that their original suspicion that Mr. Askew had committed an armed robbery – the very basis for the stop – was wrong, and they knew that a pat-down search for weapons produced nothing. Mr. Askew was entitled to be released after the robbery victim did not identify him as the person who had robbed her.

Appellant's Br. at 13-14 (internal citations and quotation marks omitted). Askew is right in what he asserts. *See, e.g.*, *United States v. Babwah*, 972 F.2d 30, 34 (2d Cir. 1992) (holding that "instead of terminating the seizure when their suspicions concerning contraband proved unfounded, the Agents continued to detain the defendants while they embarked upon [an]

expedition for evidence in the hope that something might turn up. . . . This continued detention was nothing more than an unlawful fishing expedition. The fact that it happened to be successful does not, of course, make it lawful." (internal citations and quotation marks omitted)).

The majority argues that the officers who conducted the second search of Askew may not have known of the results of the show-up when they unzipped Askew's jacket in search of contraband. This supposed ignorance on the part of the officers surely did not justify their second unlawful search of Askew. Were the courts to endorse such a rule, police officers would be free to extend *Terry* stops into indefinite detentions. It goes without saying that the Constitution does not condone this.

Apparently recognizing the fragility of this line of analysis, the Government wisely does not pursue it. In dodging the issue, the Government first acknowledges that "it is undisputed that appellant was not identified as the robber," and then "assume[s] for purposes of this appeal" that the facts support appellant's contention that "the officers' reasonable suspicion justifying the *Terry* stop . . . 'dissipated' when 'the pat down [of appellant] did not reveal a gun, and the show-up procedure did not result in a positive identification of Mr. Askew as the robber.'" Br. for Gov't at 24-25 & n.12 (quoting Appellant's Br. at 13). It is easy to understand why the Government chose to present its argument on these terms. It is clear from the record here that, after the show-up concluded, the robbery victim and the officer with her simply drove away without implicating Askew. In these circumstances, it would have been obvious to any reasonable officer on the scene that Askew had not been identified by the victim as the armed robber. Why? Because if the robbery victim had identified Askew as the armed robber, it is inconceivable to think that the officer in the car with her would have left the show-up without first alerting the remaining officers on the scene that Askew had been identified as the

armed robber. Therefore, when the officer in the car left without indicating a positive identification, the officers on the scene had no further grounds to hold Askew.

Under established Fourth Amendment law, it is not reasonable for an officer to detain a person on the street and then, *with no reasonable suspicion, probable cause, or warrant*, insist that the person remove his or her clothing or, even worse, undo the person's clothing without his or her consent. Neither the majority opinion nor the Government's brief to this court offers any authority to suggest otherwise. Askew should have been released after the show-up was completed. He certainly would have posed no threat to the officers at that point. Askew undoubtedly would have continued on his way, just as he had been doing before he was stopped by the police.

The Government argues that, because an officer felt a hard object near Askew's waist when the officer partially unzipped his jacket during the show-up procedure, "the police developed reasonable articulable suspicion during the show-up that appellant had a weapon near his waistband, which was independent of their suspicion that he had committed the robbery." Br. for Gov't at 25. Thus, according to the Government, the officers could search Askew after the show-up. And the majority, in turn, advances a claim (not raised by the Government) that the officers could search Askew after the show-up to protect themselves while disengaging from their encounter with him. These claims are fatally flawed. It is quite disingenuous for the Government to claim that any alleged risk faced by the officers during the show-up allowed the officers to search Askew after the show-up had ended. If there was any risk, it arose *during the show-up* – when a witness and several officers were nearby – not afterwards. And if the police officers had an "objectively reasonable" basis to believe that a protective search was necessary, they would have acted immediately, during the show-up, to diffuse any potential for danger. They

did not do this.  Therefore, once the officers patted down Askew and found nothing and then completed the show-up without Askew being implicated in the robbery, Askew should have been free to leave.

The crucial point that the Government simply ignores is that an

> officer's continued exploration of [a suspect's clothing] after having concluded that it contained no weapon [is] unrelated to "the sole justification of the search [under *Terry*, namely,] the protection of the police officer and others nearby."

*Dickerson*, 508 U.S. at 378 (quoting *Terry*, 392 U.S. at 29).  A continued search by the officers in these circumstances is "the sort of evidentiary search" that has been "condemned" by the Supreme Court.  *Id.*

The majority concedes that the officers' second search of Askew was conducted *only* because of the officers' initial unzipping of Askew's jacket.  In other words, the officers had no new information justifying the second search.  The second search would not have occurred if the officers had not partially unzipped Askew's jacket during the show-up.  As the Court made clear in *Dickerson*, police officers may not use the fruits of one unlawful search to justify a further search:

> Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him.  Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of [the suspect's] pocket was

> constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

*Id*. at 379. "In order to make effective the fundamental constitutional guarantee[] . . . of the . . . inviolability of the person," the Supreme Court has made it clear "that evidence seized during an unlawful search [cannot] constitute proof against the victim of the search. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (internal citation omitted); *see also United States v. Scios*, 590 F.2d 956, 959 (D.C. Cir. 1978) (en banc). Because the initial unzipping of Askew's jacket constituted an unconstitutional search of his person, it could not provide a lawful ground for the second search.

## CONCLUSION

During oral argument, the Government conceded that the District Court erred in holding that "the Fourth Amendment presents no impediment to show-ups involving suspects who are constitutionally detained." *Askew*, 313 F. Supp. 2d at 5. And the majority acknowledges that the Fourth Amendment should control the disposition of this case. The concession and acknowledgment are of little solace, however, because the majority's decision effectively holds that procedures relating to show-ups are not subject to the strictures of *Terry*. The Supreme Court has never held that police officers may search a suspect during a *Terry* stop merely to facilitate a show-up. And no federal appellate court has held that the Court's decision in *Hayes* allows police officers to continue searching a suspect after a *Terry* pat-down search produces nothing. The majority ignores this legal landscape and reaches a result never before condoned by a federal appellate court.

We are bound to follow the precedent of the Supreme Court.  *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) (per curiam) (holding that "only [the Supreme] Court may overrule one of its precedents").  The Court has not overruled *Terry* and its progeny, nor has it ever endorsed an investigative-search gloss on *Terry*.  This court has no authority to rewrite Fourth Amendment law.

I fear that, if this judgment survives as precedent, the Fourth Amendment soon will be a dead letter in our Constitution, at least with respect to cases brought before this court.